No. 23-60234

———————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

———————————

SIERRA CLUB,
*Petitioner*

v.

LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY;
ROGER W. GINGLES, in his official capacity as Secretary, Louisiana
Department of Environmental Quality,
*Respondents*

————————

COMMONWEALTH LNG, L.L.C.,
*Intervenor for Respondent.*

On Petition for Review of Orders of the Louisiana Department of
Environmental Quality

**INITIAL BRIEF OF PETITIONER**

<table>
<tr><td>

**Thomas Gosselin**
Sierra Club
P.O. Box 4998
Austin, TX 78765
Telephone: (424) 346-3276
tom.gosselin@sierraclub.org
*Attorney for Sierra Club*

</td><td>

**Josh Smith**
Sierra Club
2101 Webster St, Suite 1300
Oakland, CA 94612
Telephone: (415) 977-5560
joshua.smith@sierraclub.org
*Attorney for Sierra Club*

</td></tr>
</table>

**Louisa Eberle**
Sierra Club
1536 Wynkoop St, Suite 200
Denver, CO 80202
Telephone: (415) 977-5753
louisa.eberle@sierraclub.org
*Attorney for Sierra Club*

**Dated: September 13, 2023**

# CERTIFICATE OF INTERESTED PERSONS
## CASE NO. 23-60234

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

## **Petitioner**

Sierra Club is a nonprofit organization that is organized and exists under the laws of California.

## **Counsel for Petitioner**

Thomas Gosselin
Sierra Club
P.O. Box 4998
Austin, TX 78765
tom.gosselin@sierraclub.org

Joshua Smith
Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612
joshua.smith@sierraclub.org

Louisa Eberle
Sierra Club
1536 Wynkoop St, Suite 200
Denver, CO 80202
louisa.eberle@sierraclub.org

## Respondents

1. Louisiana Department of Environmental Quality; and

2. Roger W. Gingles, in his official capacity as Secretary, Louisiana

   Department of Environmental Quality.

## Counsel for Respondents

Elizabeth Baker Murrill, Esq.,
Assistant Attorney General
Office of the Attorney General
for the State of Louisiana
P.O. Box 94005
Baton Rouge, LA 70804-9005
murrille@ag.louisiana.gov

Courtney Burdette, Supervisory
Attorney
Jill Carter Clark
Louisiana Department of
Environmental Quality
Legal Affairs Division
P.O. Box 4302
Baton Rouge, LA 70821-4302
courtney.burdette@la.gov
jill.clark@la.gov

Roger W. Gingles
Louisiana Department of
Environmental Quality
602 N. Fifth Street
Baton Rouge, LA 70802

Shae Gary McPhee, Jr., Assistant
Solicitor General
Joseph Scott St. John
Louisiana Department of Justice
Office of the Solicitor General
909 Poydras Street, Suite 1850
New Orleans, LA 70112
mcphees@ag.louisiana.gov
stjohnj@ag.louisiana.gov

Ashley Kristen Plunkett
Louisiana Department of
Environmental Quality
Legal Department
602 N. 5th Street
Galvez Building
Baton Rouge, LA 70802
shley.plunkett@la.gov

**<u>Respondent-Intervenor</u>**

Commonwealth LNG, LLC

**<u>Counsel for Respondent-Intervenor</u>**

Beth Bivans Petronio, Esq., Trial Attorney
K & L Gates, L.L.P.
1717 Main Street, Suite 2800
Dallas, TX 75201
beth.petronio@klgates.com

***<u>s/ Thomas Gosselin</u>***
Thomas Gosselin
Sierra Club
P.O. Box 4998
Austin, TX 78765
Telephone: (424) 346-3276
tom.gosselin@sierraclub.org

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 28.2.3, Sierra Club respectfully requests that the Court hold oral argument in this case. At issue is whether the Louisiana Department of Environmental Quality violated the Clean Air Act when it issued permits authorizing construction and operation of the Commonwealth LNG terminal. Sierra Club respectfully submits that oral argument would assist the Court with the technical and complex factual and legal issues as well as the voluminous administrative record in this case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................i

REQUEST FOR ORAL ARGUMENT.....................................................iv

TABLE OF AUTHORITIES...................................................................viii

GLOSSARY ........................................................................................ xv

JURISDICTIONAL STATEMENT ........................................................1

    I.  Venue and Forum ........................................................................ 1

    II.  Standing........................................................................................ 2

STATEMENT OF ISSUES....................................................................7

STATEMENT OF THE CASE ..............................................................9

    I.  Introduction .................................................................................9

    II.  Legal Framework.......................................................................10

        A.   The Clean Air Act .............................................................10

        B.   National Ambient Air Quality Standards........................11

        C.   Prevention of Significant Deterioration ..........................11

            i.  Cause or Contribute Demonstration..........................12

            ii.  Best Available Control Technology.............................15

        D.   Public Trust Duty .............................................................16

    III.  Factual Background...................................................................17

        A.   Project Overview...............................................................17

        B.   Procedural History............................................................18

        C.   The Final Permit...............................................................19

SUMMARY OF ARGUMENT ..............................................................20

ARGUMENT ..................................................................................22

I.   Standard of Review......................................................22

II.  LDEQ's Use of Significant Impact Levels to Determine the
     Project Would Not Cause or Contribute to a NAAQS
     Exceedance Was Arbitrary and Unlawful................................26

     A.   LDEQ Unlawfully Failed to Require a Demonstration
          That Commonwealth Would Not Cause or Contribute
          to a NAAQS Violation for Multiple Pollutants. ...............27

     B.   Even if the Clean Air Act Allows Limited *De Minimis*
          Exceptions, the SILs Cannot Excuse Commonwealth's
          Contributions to the NO$_x$ NAAQS Exceedances Here. .....33

          i.   The NO$_2$ SIL Is Unavailable Because Air Quality
               Modeling Shows that the Project Area Is Violating
               the 1-hour NO$_2$ NAAQS. ............................................34

          ii.  LDEQ's "Time and Space" Restriction Violates the
               Clean Air Act and Cannot Erase Commonwealth's
               Contributions to These Modeled Violations. .............37

     C.   LDEQ's Reliance on AP-42 Factors Further
          Undermined Its Application of the SILs. .........................41

III. LDEQ Failed to Ensure Compliance with BACT.....................44

     A.   Commonwealth and LDEQ Failed to Require an
          Emission Limit Constituting the Maximum Degree of
          Reduction for NO$_x$ Emitted from the Combustion
          Turbines. ........................................................................45

     B.   LDEQ Failed to Require BACT for NO$_x$ Emissions
          from the Oxidation System...............................................49

IV.  LDEQ Violated Louisiana Code Section 30:2018 by Failing
     to Assess the Potential and Real Adverse Environmental
     Effects of the Proposed Commonwealth Facility and

Whether Alternatives Could Avoid Those Impacts to the Maximum Extent Possible............................................52

A.  LDEQ Arbitrarily Relied on Technical Compliance with Regulatory Requirements to Support a Finding of No Adverse Impacts............................................54

B.  LDEQ Arbitrarily Relied on Minimum Permitting Requirements as Dispositive to Its Analyses of Potentially Adverse Impacts. ............................................57

C.  LDEQ Arbitrarily Dismissed Known Adverse Health Risks from Exposure to $NO_2$, Air Toxics, and Particulate Matter. ............................................58

  i.  Nitrogen Dioxide............................................58

  ii.  Air Toxics and Particulate Matter ............................62

D.  LDEQ Arbitrarily Rejected Alternatives that Would Have Reduced Environmental Impacts. ............................64

V.  Vacatur Is the Appropriate Remedy. ............................69

CONCLUSION ............................................72

CERTIFICATE OF SERVICE............................................74

CERTIFICATE OF COMPLIANCE............................................75

CERTIFICATE OF ELECTRONIC COMPLIANCE ............................76

# TABLE OF AUTHORITIES

## Cases

*ADEC v. EPA,*
540 U.S. 461 (2004) ............................................................... 45

*Ala. Power Co. v. Costle,*
636 F.2d 323 (D.C. Cir. 1979) .......................... 12, 29, 30, 38

*Alaska Dep't of Envtl. Conservation v. EPA,*
540 U.S. 461 (2004) ........................................................ 15, 45

*American Trucking Ass'n v. EPA,*
283 F.3d 355 (D.C. Cir. 2002) ...................................... 60, 63

*Appalachian Voices v. State Water Control Bd.,*
912 F.3d 746 (4th Cir. 2019) ............................................... 22

*Atl. City Elec. Co. v. FERC,*
295 F.3d 1 (D.C. Cir. 2002) ................................................. 32

*Bell v. Cheswick Generating Station,*
734 F.3d 188 (3d Cir. 2013) ................................................ 55

*Bilski v. Kappos,*
561 U.S. 593 (2010) .............................................................. 56

*Bluewater Network v. EPA,*
370 F.3d 1 (D.C. Cir. 2004) .......................................... 28, 31

*BNSF Ry. Co. v. United States,*
775 F.3d 743 (5th Cir. 2015) ............................................... 55

*Bowers v. Firefighters Ret. Sys.,*
2008–C–1268 (La. 3/17/2009), 6 So.3d 173 .......................... 23

*Calvert Cliffs' Coordinating Comm. v. U. S. Atomic Energy Comm'n*,
  449 F.2d 1109 (D.C. Cir. 1971) ............................................................ 56

*Catawba Cnty., N.C. v. E.P.A.*,
  571 F.3d 20 (D.C. Cir. 2009) ............................................................... 28

*Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.*,
  686 F. Supp. 2d 663 (E.D. La 2010) ...................................................... 3

*Consumer Electronics Ass'n v. FCC*,
  347 F.3d 291 (D.C. Cir. 2003) ............................................................. 30

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*,
  45 F.4th 846 (5th Cir. 2022) ............................................................... 70

*Esch v. Yeutter*,
  876 F.2d 976 (D.C. Cir. 1989) ............................................................. 71

*Friends of Buckingham v. State Air Pollution Control Bd.*,
  947 F.3d 68 (4th Cir. 2020) ........................................................... 23, 50

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) .............................................................................. 2

*Gulf Restoration Network v. Salazar*,
  683 F.3d 158 (5th Cir. 2012) ................................................................ 7

*Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*,
  452 U.S. 264 (1981) ............................................................................ 10

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) .............................................................................. 7

*In re Browning-Ferris Indus. Petit Bois Landfill*,
  93-2050 (La. App. 1st Cir. 6/23/95), 657 So.2d 633 ............................ 65

*In re La. Dept. of Env't Permit No. 2560-00292-00 To Petroplex Int'l, LLC*,
  2011 WL 1225871, *2 (La. App. 1 Cir. 3/25/2011) ............................... 24

ix

*In re Masonite Corp.*,
  5 E.A.D. 551 (EAB 1994) .................................................... 45

*In re Oil & Gas Expl., Dev., & Prod. Facilities*,
  2010-1640 (La. App. 1 Cir. 6/10/11), 70 So. 3d 101 ........................... 16

*In re Waste Management of Louisiana, LLC*,
  2007 WL2377337 (La.App. 1st Cir. 2007) ......................................... 32

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................. 7

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ............................................................ 30

*Matter of Am. Waste & Pollution Control Co.*, CA-92-1019 (La. Ct. App.
  1993), 633 So. 2d 188 ......................................................... 57

*Matter of Dravo Basic Materials Co., Inc.*,
  CA-90-1525 (La. App. 1 Cir. 1992), 604 So. 2d 630 ....................... 57, 64

*MCI Telecomm. Corp. v. Bell Atl. Pennsylvania*,
  271 F.3d 491 (3d Cir. 2001) ................................................... 25

*Medellin v. Bustos*,
  854 F.2d 795 (5th Cir. 1988) .............................................. 32, 36

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*,
  463 U.S. 29 (1983) ..................................................... 24, 25, 52

*Multi–Care v. State, Dept. of Health & Hospitals*,
  00–2001 (La. App. 1st Cir. 11/9/01), 804 So.2d 673, 675 ................... 24

*Pennsauken Cnty., N.J., Res. Recovery Facility*,
  2 E.A.D. 667 (Adm'r 1988) ................................................... 52

*Public Citizen v. Young*,
  831 F.2d 1108 (D.C. Cir. 1987) ............................................. 30

x

*Safe Air for Everyone v. EPA*,
  488 F.3d 1088 (9th Cir. 2007) ............................................................. 10

*Save Our Cmty. v. U.S. EPA*,
  971 F.2d 1155 (5th Cir. 1992) ........................................................... 3, 6

*Save Our Wetlands, Inc. v. Sands*,
  711 F.2d 634 (5th Cir. 1983) .................................................................. 6

*Save Ourselves, Inc. v. Louisiana Envtl. Control Comm'n*,
  83-C-1480 (La. 1984), 452 So. 2d 1152 ........... 16, 25, 53, 56, 57, 65, 70

*Shrimpers and Fisherman of RGV v. Tex. Comm'n on Envtl. Quality*,
  968 F.3d 419 (5th Cir. 2020) .................................................................. 2

*Sierra Club v. EPA*,
  705 F.3d 458 (D.C. Cir. 2013) (Sierra Club I). ................. 14, 28, 32, 33

*Sierra Club v. EPA*,
  955 F.3d 56 (D.C. Cir. 2020) (Sierra Club II) ..................................... 14

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*,
  73 F.3d 546 (5th Cir. 1996) .................................................................... 6

*St. Tammany Par. Gov't v. Welsh*,
  2015-1152 (La. App. 1 Cir. 3/9/16), 199 So. 3d 3 ............................... 62

*Sw. Elec. Power Co. v. U.S. EPA*,
  920 F.3d 999 (5th Cir. 2019) ............................................................... 25

*Swindol v. Aurora Flight Scis. Corp.*,
  805 F.3d 516 (5th Cir. 2015) ......................................................... 42, 71

*Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*,
  207 F.3d 789 (5th Cir. 2000) .................................................................. 4

*Texas v. Biden*,
  20 F.4th 928 (5th Cir. 2021) ............................................................... 70

*Town of Weymouth, Mass. v. Mass. Dep't of Envt'l Prot.*,
   961 F.3d 34 (1st Cir. 2020) .................................................... 51

*Township of Bordentown, N.J. v. FERC*,
   903 F.3d 234 (3rd Cir. 2018) ......................................... 22, 25

*United States v. Ameren Mo.*,
   421 F. Supp. 3d 729 (E.D. Mo. 2019) ............................. 59, 61

*United States v. Clintwood Elkhorn Mining Co.*,
   553 U.S. 1 (2008) ............................................................ 29, 30

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ............................................................. 35

## Statutes

15 U.S.C. § 717b ...................................................................... 2

15 U.S.C. § 717r ...................................................................... 1

42 U.S.C. § 7401 ...................................................................... 1

42 U.S.C. § 7407 .............................................................. 11, 31

42 U.S.C. § 7409 .............................................................. 11, 34

42 U.S.C. § 7410 .............................................................. 10, 34

42 U.S.C. § 7426 .................................................................... 31

42 U.S.C. § 7470 .................................................................... 31

42 U.S.C. § 7470-7479 ........................................................... 11

42 U.S.C. § 7475 ................................ 12, 14, 26, 28, 29, 33, 43, 44

42 U.S.C. § 7547 .................................................................... 31

42 U.S.C. § 7661a ................................................................. 12

42 U.S.C. § 7661c ................................................... 12, 34, 38

7 U.S.C. § 7416 .................................................................... 55

La. R.S. 30:2001 ........................................................ 17, 53, 56

La. R.S. 30:2014.A .............................................................. 16

La. R.S. 30:2018 .................................................................. 64

La. R.S. 30:2018.B ................................................ 16, 53, 55, 57

La. R.S. 30:2050.21 ............................................................... 2

## Regulations

40 C.F.R. § 51.165 ....................................... 20, 26, 32, 33, 39

40 C.F.R. § 52.21 ....................................... 46, 47, 49, 51, 52

40 C.F.R. § 52.970 .............................................. 2, 10, 16, 53

40 C.F.R. pt. 50 .................................................................. 11

40 C.F.R. pt. 51, App. W .............................................. 12, 26

LAC 33:III.101 ...................................................................... 2

LAC 33:III.509 ...................... 12, 13, 15, 26, 33, 39, 44, 46, 47, 49, 51, 52

LAC 33:III.519 .................................................................... 12

## Federal Register Notices

75 Fed. Reg. 64,864 (Oct. 20, 2010)............................................. 13, 36, 39

75 Fed. Reg. 6474 (Feb. 9, 2010) .............................................................58

## Other Authorities

3 Oxford English Dictionary (2d ed.1989) ..............................................29

EPA, Guidance Concerning the Implementation of the 1-hour NO2
    NAAQS for the Prevention of Significant Deterioration Program Att.
    1 ("2010 SIL Guidance") (June 29, 2010) ...................................... 13, 61

EPA, Promising Practices for EJ Methodologies in NEPA Reviews
    (2016) ("Promising Practices")............................................................61

H.R. Rep. No. 95-294 (1977)..............................................................29, 38

Holtzclaw, To Defer or Not To Defer: The Standard of Review Regarding
    Administrative Rulings In The Appellate Courts of Louisiana, 40 S.U.
    L. Rev. 435 (Spring 2013) ...................................................................24

Memorandum from Stephen D. Page, EPA OAQPS, to EPA Regional Air
    Division Directors, "Guidance for PM2.5 Permit Modeling," May 20,
    2014 ("2014 SILs Guidance")..............................................................36

S. Rep. No. 95-127 (1977).....................................................................29

Webster's Third New International Dictionary (1993) ..........................29

# GLOSSARY

The following acronyms and abbreviations are used in this brief:

| | |
|---|---|
| BACT | Best Available Control Technology |
| CO | Carbon Monoxide |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| FERC | Federal Energy Regulatory Commission |
| GHG | Greenhouse Gas |
| LDEQ | Louisiana Department of Environmental Quality |
| LNG | Liquefied Natural Gas |
| NAAQS | National Ambient Air Quality Standards |
| $NO_x$ | Nitrogen Oxide |
| $NO_2$ | Nitrogen Dioxide |
| NEPA | National Environmental Policy Act |
| PSD | Prevention of Significant Deterioration |
| $PM_{10}$ | Particle Matter 10 Microns or Less in Diameter |
| $PM_{2.5}$ | Particle Matter 2.5 Microns or Less in Diameter |
| SILs | Significant Impact Levels |
| SIP | State Implementation Plan |
| $SO_2$ | Sulfur Dioxide |
| VOC | Volatile Organic Compound |

# JURISDICTIONAL STATEMENT

## I. Venue and Forum

This petition concerns two Clean Air Act permits[1] issued by Louisiana Department of Environmental Quality ("LDEQ") allowing construction and operation of the Commonwealth LNG, LLC ("Commonwealth") liquified natural gas ("LNG") export facility. *See* AR70 (Permit PSD-LA-841); AR69 (Permit 0560-00997-V0).[2]

Under the Natural Gas Act, 15 U.S.C. § 717r(d)(1), this Court "shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a State administrative agency acting pursuant to Federal law to issue… any permit" for the construction of an LNG facility within this Circuit. LDEQ issues permits under the Federal Clean Air Act and Louisiana's federally-enforceable State Implementation Plan ("SIP"). *See* 42 U.S.C. § 7401, *et. seq.*; 40 C.F.R. §

---

[1] Unless a specific permit is identified, this brief refers to the two permits collectively as the "permit" for simplicity.

[2] This brief cites to the document numbers in the Certified Index and specific page numbers within each document, *e.g.*, AR document ## : page #. Pincites in documents 1-72, which were stamped for entry into LDEQ's EDMS database, refer to the EDMS-stamped number. Pincites in the remaining documents refer to the document's numbering system.

52.970(c) (identifying EPA-approved regulations in the Louisiana SIP);

LAC 33:III.101, *et. seq.* (Louisiana SIP provisions).

The proposed facility is subject to regulation under 15 U.S.C. §

717b(e) and located within this Circuit. LDEQ issued the challenged

permits on March 28, 2022. AR70:3. Sierra Club timely filed this

petition for review. La. R.S. 30:2050.21(A).

## II.  Standing

An organization has standing if individual members would have

standing, the interests at stake are germane to the organization's

purpose, and the lawsuit does not require participation of individual

members. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC),*

*Inc.*, 528 U.S. 167, 181 (2000).

Sierra Club's members have standing because (1) they have

suffered a concrete and imminent "injury in fact"; (2) that is fairly

traceable to the challenged action; and (3) is likely to be redressed by a

favorable decision. *Friends of the Earth,* 528 U.S. at 180–81 (internal

citations omitted); *Shrimpers & Fisherman of RGV v. Tex. Comm'n on*

*Envtl. Quality*, 968 F.3d 419, 424 (5th Cir. 2020). Any "harm to

aesthetic, environmental, or recreational interests is sufficient to confer

2

standing, . . . and these injuries need not be large, an identifiable trifle will suffice." *Save Our Cmty. v. U.S. EPA*, 971 F.2d 1155, 1161 (5th Cir. 1992).

Here, LDEQ's permitting decision–which will allow harmful nitrogen oxide, fine particle, and toxic air pollution–will adversely affect Sierra Club's members' use and enjoyment of their property and the natural resources where they live and recreate. One member, John Allaire, owns roughly 300 acres of land abutting the Commonwealth site and his home is located approximately 800 feet (0.15 miles) from Commonwealth's fence line and approximately 1,700 feet from a proposed 300-foot tall flare, which will be visible from his property. Allaire Decl. ¶¶12, 14; AR90:4-168. When standing in his front yard, Mr. Allaire will inhale harmful and malodorous nitrogen oxide, particulate matter, and toxic air pollution emitted from Commonwealth. Allaire Decl. ¶¶14-16; AR90:4-227 to 4-229 (showing nitrogen oxides and particulate matter impacts within 1,700 feet of the facility); *Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.*, 686 F. Supp. 2d 663, 670-71 (E.D. La. 2010). Breathing and smelling polluted air from Commonwealth will substantially interfere with Mr. Allaire's

daily life and make it harder for him to fish, hunt, birdwatch, stargaze, or otherwise enjoy time outdoors on his property. Allaire Decl. ¶¶4, 14, 18-21. These injuries confer standing. *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir. 2000) ("breathing and smelling polluted air is sufficient to demonstrate injury-in-fact").

Other members will suffer similar injuries. James Hiatt visits Mr. Allaire's property at least once per month to observe birds and wildlife, view sunsets, and host community events. Hiatt Decl. ¶¶6, 13. Cynthia Robertson visits Mr. Allaire's property approximately once every four to six weeks to enjoy nature and watch birds and wildlife. Robertson Decl. ¶12. Their enjoyment of these visits will be impaired due to their concerns about exposure to air pollution. Hiatt Decl. ¶¶9-11; Robertson Dec. ¶13. Because of increased pollution and the sight of the Commonwealth facility, they are likely to visit the area less. Hiatt Decl. ¶¶7, 13; Robertson Decl. ¶13.

Members will be injured by Commonwealth LNG's air pollution during regular recreation and wildlife-viewing trips to other nearby locations, including: (1) an old fish processing plant, approximately one

4

mile north of Commonwealth; and (2) Holly Beach, approximately five miles west. Allaire Decl. ¶4; Hiatt Decl. ¶8; Robertson Decl. ¶¶10-11. Exposure to increased air pollution levels at these locations will jeopardize their health and detract from their enjoyment of the area. Hiatt Decl. ¶¶9-13; Robertson Decl. ¶¶11, 13-14, 17-19.

Separately, members will experience injuries to their aesthetic and recreational interests. These members regularly birdwatch, observe wildlife, and enjoy natural beauty on Mr. Allaire's 300-acre ranch and nearby. Allaire Decl. ¶¶4, 14, 18-21; Hiatt Decl. ¶¶6, 13; Robertson Decl. ¶12. Construction and operation of Commonwealth will diminish their enjoyment of those activities because the facility's construction, unsightly flares, and significant light and noise pollution, will be readily visible and audible from the Allaire property. AR90:4-244, 4-246. Thus, Commonwealth will negatively impact these members' recreational and aesthetic interests.

These visual impacts will similarly detract from Sierra Club's members' recreational pursuits at the fish processing plant and Holly Beach, where Sierra Club's members regularly visit to observe wildlife, take the ferry, and exercise. Hiatt Decl. ¶8; Robertson Decl. ¶¶10-11.

5

Petitioners' members enjoy visiting these areas largely because they can recreate with limited visual impacts of industrial development. Hiatt Decl. ¶¶5, 13; Robertson Decl. ¶¶10-11, 18. Because the terminal site is can be seen without visual aids, if it is constructed, their recreational enjoyment here at these places will be ruined. Hiatt Decl. ¶¶9, 13; Robertson Decl. ¶¶13, 18. These injuries confer standing. *Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 640 (5th Cir. 1983); *Save Our Cmty.*, 971 F.2d at 1161.

These injuries are fairly traceable to the permits, which authorize Commonwealth to emit pollution and construct the facility that would cause the injuries. Moreover, there is a close geographic and causal nexus between Commonwealth's permitted harmful pollution and where Sierra Club's members breathe and recreate. *Compare* Hiatt Decl. Att. A (showing locations frequented by members); *with* AR37 at 231 (showing $NO_2$ concentrations in excess of the "significant impact level" at these areas). That is sufficient to demonstrate traceability. *See Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 558 (5th Cir. 1996) (traceability "does not require that the plaintiffs show to a scientific certainty that [the] defendant's effluent, and [the]

6

defendant's effluent alone, caused the precise harm suffered by the plaintiffs") (quotation marks and citation omitted).

A favorable decision vacating or remanding the permits would redress these injuries. On remand, LDEQ will evaluate whether to require more stringent emission controls or deny the permit. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572, 572 n.7 (1992).

The interests at issue here are germane to Sierra Club's purpose to protect public health and the environment. Hughes Decl. ¶¶3-7; *see Gulf Restoration Network v. Salazar,* 683 F.3d 158, 168 (5th Cir. 2012). Moreover, neither the claims asserted nor the relief sought requires participation of any individual member. *Id.* (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977)).

Sierra Club has standing.

## STATEMENT OF ISSUES

This case presents three issues:

1. Before permitting any new source of pollution under the Clean Air Act's Prevention of Significant Deterioration program, LDEQ must ensure that the source will not cause or contribute to a violation of the National Ambient Air Quality Standards, or reduce the impact of

7

its pollution. 42 U.S.C. § 7475(a)(3); 40 C.F.R. § 51.165(b)(2). Did LDEQ violate the Act in issuing the Commonwealth preconstruction permit when undisputed air quality modeling demonstrates frequent and significant violations of the national nitrogen dioxide standard in areas affected by the facility's emissions?

2. Under the Clean Air Act, LDEQ must also ensure that any new source uses "best available control technology" for air pollutants, including nitrogen dioxide. Did LDEQ violate the Act when it issued the Commonwealth preconstruction permit without requiring the facility to meet technically and economically feasible emission limits for nitrogen oxides?

3. Under Louisiana's public trustee statute, which the state has incorporated into its federally-enforceable Clean Air Act regulations, LDEQ must assess and avoid the "potential" adverse environmental effects of any permit to the maximum extent possible. Did LDEQ violate its public trustee duty when it:

  a. concluded that Commonwealth's emissions will not result in adverse impacts, even though air quality modeling predicts frequent and significant violations of health-based nitrogen

dioxide standards, and when nearby communities already face

significantly elevated air toxics cancer and particulate matter

risk?

b.  summarily rejected technically and economically feasible

alternatives that would reduce those impacts?

## STATEMENT OF THE CASE

## I.  Introduction

Commonwealth proposes to construct and operate an LNG

terminal near Lake Charles, in Cameron Parish, Louisiana. AR70:4. If

built, Commonwealth would exacerbate existing poor air quality in

Cameron Parish by emitting thousands of tons of air pollution each

year. AR02:273. Petitioner Sierra Club challenges Respondents'

(collectively "LDEQ") decision to issue two Clean Air Act permits

allowing Commonwealth to construct and operate its proposed facility.

There are three core issues in this case—whether the impacts of

Commonwealth LNG's air pollution emissions were properly assessed

and mitigated, whether Commonwealth LNG will have to comply with

adequate emission limits, and whether LDEQ satisfied its duty protect

Louisiana's environment. Despite modeling that demonstrates Cameron

Parish is already exceeding health-based National Ambient Air Quality Standards ("NAAQS") for at least nitrogen dioxide ("NO₂"), LDEQ failed to fulfill these basic obligations. Accordingly, LDEQ's permitting decision is arbitrary and the permits should be vacated.

## II.    Legal Framework

### A. The Clean Air Act

The Clean Air Act establishes a system of cooperative federalism for regulating new sources of air pollution. *See* 42 U.S.C. § 7410. The U.S. Environmental Protection Agency ("EPA") sets minimum standards and the states administer the various regulatory programs. *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 269 (1981). Louisiana does this through a "state implementation plan" or "SIP," subject to EPA approval. 42 U.S.C. § 7410(a)(1)-(2); *see* 40 C.F.R. § 52.970(c) (identifying EPA-approved regulations in the Louisiana SIP); LAC 33:III.101, *et seq.* (Louisiana's SIP regulations). Once approved, SIP provisions become federally enforceable. *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1096–97 (9th Cir. 2007).

B. <u>National Ambient Air Quality Standards</u>

The National Ambient Air Quality Standards ("NAAQS")— are health-based standards that limit the ambient concentration of "criteria pollutants," *i.e.* ubiquitous pollutants that are harmful to human health. 42 U.S.C. § 7409. EPA sets the NAAQS at a level "requisite to protect the public health," with "an adequate margin of safety." *Id.* § 7409(b)(1).

There are NAAQS for six pollutants: carbon monoxide ("CO"), lead, nitrogen dioxide ("$NO_2$"), ozone, particulate matter ($PM_{10}/PM_{2.5}$), and sulfur dioxide ("$SO_2$"). *See* 40 C.F.R. pt. 50. Once EPA sets the NAAQS, it designates geographic areas as an "attainment area," a "nonattainment area," or "unclassifiable." 42 U.S.C. § 7407(d)(1)(A).

C. <u>Prevention of Significant Deterioration</u>

To ensure that new sources of pollution do not erode air quality in attainment areas, the Prevention of Significant Deterioration ("PSD") program requires new sources to obtain a preconstruction permit and demonstrate, *inter alia*, that it (1) will not cause or contribute to any violation of the NAAQS and (2) will install and operate the "best available control technology" ("BACT") for each criteria pollutant. *See*

11

42 U.S.C. §§ 7470-7479; *Ala. Power Co. v. Costle*, 636 F.2d 323, 362

(D.C. Cir. 1979) (identifying the permitting process as the principal

mechanism for maintaining air quality). A proposed new major source,

like Commonwealth, cannot commence construction without a PSD

permit. 42 U.S.C. § 7475.[3]

    i.  Cause or Contribute Demonstration

To obtain a PSD permit, new sources must "demonstrate" with

computer modeling that their emissions, with other nearby sources of

pollution, will "not cause or contribute to air pollution in violation of …

any national ambient air quality standard in any air quality control

region." LAC 33:III.509.K.1 and L.1; *see also* 40 C.F.R. pt. 51, App. W §§

8.1, 8.3, 9.2; 42 U.S.C. § 7475(a)(3).

If modeling shows the proposed new source will cause or

contribute to a violation, LDEQ *cannot* issue the requested PSD permit.

LAC 33:III.519.C.5. In those circumstances, to obtain a permit, the

source must "reduce the impact of its emissions upon air quality by

---

[3] Major sources also must obtain a Title V permit. *See* 42 U.S.C. §§
7661a, 7661c. These permits include all requirements governing
operation of the source. The Title V permit here was issued in tandem
with the PSD permit, but LDEQ's compliance with the Clean Air Act's
Title V requirements is not directly at issue.

obtaining sufficient emission reductions to, at a minimum, compensate for its adverse ambient impact where the major source … would otherwise cause or contribute to a violation[.]" 40 C.F.R. § 51.165(b)(3); *see also* LAC 33:III.509.K.

Where there is no threat of a NAAQS violation, EPA has provided non-binding guidance allowing state permitting agencies to conduct an abbreviated analysis. Specifically, if the source's impacts are below "significant impact levels" ("SILs"), which EPA typically sets at 4% of the NAAQS, EPA's guidance purports to allow states to exempt sources from making a robust NAAQS compliance demonstration.[4]

The SILs framework presents legal and practical risks. The thresholds are neither health-based nor indicative of pollution risks. Indeed, new pollution, even if below the SIL, can cause or exacerbate NAAQS violations. Accordingly, SILs cannot excuse pollution, even in small amounts, where the NAAQS will be violated. 75 Fed. Reg. 64,864, 64,892 (Oct. 20, 2010) ("[N]otwithstanding the existence of a SIL,

---

[4] EPA, *Guidance Concerning the Implementation of the 1-hour NO$_2$ NAAQS for the Prevention of Significant Deterioration Program* Att. 1 ("2010 SIL Guidance") at 12 (June 29, 2010), https://www.epa.gov/sites/default/files/2015-07/documents/appwno2.pdf.

permitting authorities should determine when it may be appropriate to conclude that even a *de minimis* impact will 'cause or contribute' to an air quality problem and to seek remedial action from the proposed new source or modification.").

The D.C. Circuit, meanwhile, vacated EPA's prior attempt to codify SILs, because SILs "allow permitting authorities to automatically exempt sources with projected impacts below the SILs from having to make the demonstration required under 42 U.S.C. § 7475(a)(3), even in situations where the demonstration may require a more comprehensive air quality analysis." *Sierra Club v. EPA* (*Sierra Club I*), 705 F.3d 458, 465 (D.C. Cir. 2013). EPA lacks "authority to exempt sources from the requirements of the Act" and the D.C. Circuit invalidated those regulations. *Id.*

EPA subsequently attempted to authorize the unlawful SILs in non-binding guidance. AR75 ("2018 SILs Guidance"). This survived a recent legal challenge because it was not final agency action. *Sierra Club v. EPA* (*Sierra Club II*), 955 F.3d 56, 63-64 (D.C. Cir. 2020). But as discussed in Argument Section II, the guidance and LDEQ's application thereof suffer the same legal defects as the regulation.

14

ii. <u>Best Available Control Technology</u>

Separately, new sources must use Best Available Control

Technology ("BACT"):

> *[A]n emissions limitation* … based on the
> *maximum degree of reduction* for each pollutant
> subject to regulation under this Section that would
> be emitted from any proposed major stationary
> source or major modification that the
> administrative authority, on a case-by-case basis,
> taking into account energy, environmental, and
> economic impacts and other costs, determines is
> achievable for such source … through application
> of … techniques for control of such pollutant."

LAC 33:III.509.B (emphasis added).

To determine BACT, LDEQ must conduct a five part, top-down

analysis, identifying all possible pollution control options, eliminating

technically infeasible ones, ranking the options based on effectiveness,

and ultimately selecting a numeric limit based on a designated

pollution control technology. AR02:272; AR70:7; *see also* AR93:B.6-B.7

(EPA BACT Guidance adopted by LDEQ here). If an applicant selects

any numeric limit other than the most stringent, it must provide a

thorough, well-documented rationale. *Alaska Dep't of Envtl.*

*Conservation v. EPA*, 540 U.S. 461, 497 (2004).

D. Public Trust Duty

Before issuing any permit for the construction or operation of a major source like Commonwealth, LDEQ must also ensure that the potential adverse environmental impacts of the proposed project "have been minimized or avoided as much as possible." *Save Ourselves, Inc. v. La. Envtl. Control Comm'n,* 83-C-1480 (La. 1984), 452 So. 2d 1152, 1157; *see also* La. R.S. 30:2014.A(4). Specifically, LDEQ must assess and avoid the "potential and real adverse environmental effects of the proposed permit activities" to the maximum extent possible, and evaluate "alternatives to the proposed activity which would offer more protection to the environment without unduly curtailing non-environmental benefits." La. R.S. 30:2018.B.1-3; *see also In re Oil & Gas Expl., Dev., & Prod. Facilities*, 2010-1640, p. 4 (La. App. 1 Cir. 6/10/11), 70 So. 3d 101, 104 (LDEQ must ensure that "potential and real adverse environmental effects of the proposed project have been avoided to the maximum extent possible").

This obligation—commonly referred to as LDEQ's "public trustee" duty—has been codified in Louisiana's Environmental Quality Act, and incorporated into its federally-enforceable SIP. *See* 40 C.F.R. § 52.970(c)

16

(identifying EPA-approved regulations in the Louisiana SIP, including LAC 33:III.101, which authorizes LDEQ's issuance of air permits "in accordance with La. R.S. 30:2001 *et seq.*").

## III. Factual Background

### A. Project Overview

Commonwealth would liquefy domestic gas and export it. AR90:1-3. The terminal would consist of six liquefaction "trains" that purify and liquify gas so it can be loaded onto ships. *Id.* at 2-1. Additionally, it would include, *inter alia*: (1) nine combustion turbines to power the refrigeration compressors and other facility components; and (2) two thermal oxidizers that combust waste gas. AR69:7. In all, the facility would produce 9.5 million metric tonnes per annum of LNG. AR90:ES-1, ES 1-1 n.3.

The facility would be located in Cameron Parish, Louisiana, roughly 900 feet north of the Gulf of Mexico and 2.5 miles southwest of the town of Cameron. *Id.* at 3-40. Commonwealth proposes to construct on an untouched 393-acre parcel consisting of high grass coastal marsh, coastal live-oak hackberry forest, and 81 acres of habitat for the endangered eastern black rail birds. AR71:95; AR90:146, 151, 205. One

permanent residence is located roughly 750 feet from the LNG facility

fence line and 1,700 feet from planned facility structures. *Id.* at 4-172;

Allaire Decl. ¶¶12, 14. The Commonwealth site is also approximately

0.3 miles from the Calcasieu Pass LNG Project, another large industrial

facility. *Id.* at 4-169.

The facility would be located in a significantly burdened area. The

Air Toxics Cancer Risk and Respiratory Hazard Index for residents

within two miles of the proposed facility are higher than 80-90% of the

rest of the country. AR71:27. The area has more particulate pollution

and sources of particulate matter than 70% of the nation. *Id.* Modeling

establishes that Southwest Louisiana will have $NO_2$ concentrations

above the NAAQS when Commonwealth's emissions are added to

already-permitted sources. AR10:41; AR37:232. These impacts would

occur in an area with a disproportionately high low-income and

minority population. AR14:724-25.

B. Procedural History

In April 2021, Commonwealth applied for the instant PSD and

Title V permits. AR2:1. In February 2022, LDEQ issued a public notice

inviting public comment. AR16:1-4. LDEQ received voluminous

comments opposing the project, including roughly 90 distinct comments from individuals and diverse organizations. AR71:31, 120-190 (identifying distinct comments in footnotes 7, 160, 173, 179, 185, 195, 196, 206, 209, 210-215, 219-21, 224-26, 256-329). Sierra Club submitted legal and expert comments, detailing numerous flaws with Commonwealth's application and LDEQ's proposed permits. AR37:106-59, 161-97, 224-36.

On March 28, 2023, despite the substantial opposition to and the numerous flaws in Commonwealth's application, LDEQ issued the permits with minimal changes. *See* AR70. Sierra Club timely filed this petition for review on April 27, 2023.

C. The Final Permit

As shown in the table below, the Commonwealth PSD permit authorizes substantial emissions. AR69:3-4.

| Pollutant | Emissions (tons/year) |
|-----------|----------------------|
| $PM_{10}/PM_{2.5}$ | 223.93 |
| $SO_2$ | 63.25 |
| $NO_x$ | 375.63 |
| CO | 917.40 |
| VOC, total | 151.91 |
| GHG | 3,546,686 |

| VOC Toxic Air Pollutants[5] | 19.87 |
|---|---|
| Non-VOC Toxic Air Pollutants[6] | 151.74 |

## SUMMARY OF ARGUMENT

LDEQ's issuance of the Commonwealth PSD permit was arbitrary and contrary to law.

First, LDEQ wrongly used SILs to avoid demonstrating that Commonwealth will not cause or contribute to NAAQS violations. Part II. In doing so, LDEQ used SILs–and Commonwealth's purportedly insignificant impacts–to excuse the facility from further analysis for the majority of pollutants. And even though Commonwealth's own modeling predicts significant local violations of the NAAQS for $NO_2$, LDEQ again relied on Commonwealth's supposedly insignificant contribution to those violations to allow the facility to dodge emission reductions necessary to avoid those violations under 40 C.F.R. § 51.165(b)(2).

---

[5] VOC toxic air pollutants include hazardous VOCs like benzene, formaldehyde, ethyl benzene, and toluene. These VOCs are included in the VOC total above, but listed separately in the permit due to their toxicity.

[6] Non-VOC toxic air pollutants include ammonia, arsenic, hydrogen sulfide, lead, and mercury.

LDEQ's reliance on the SILs in this manner was error. The Clean Air Act does not authorize *de minimis* exceptions to this demonstration requirement. Part II.A. Even if *de minimis* exceptions are acceptable sometimes, they cannot apply where record evidence demonstrates NAAQS exceedances. Part II.B.

LDEQ compounded that error by relying on AP-42 emission factors to determine Commonwealth's "potential to emit" air pollutants, despite EPA's caution against doing so. Part II.C. Those emission factors materially undercounted Commonwealth's emissions, thereby fundamentally undermining LDEQ's "cause or contribute" and public-trustee analyses. Parts II.C & IV.

Second, LDEQ wrongly concluded that Commonwealth had selected BACT for $NO_x$ emissions. Part III. Specifically, LDEQ failed to require the "maximum degree of reduction" achievable for $NO_x$ emissions from Commonwealth's combustion turbines, Part III.A, and its oxidation system, Part III.B.

Third, LDEQ failed to fulfill its public trust duty to evaluate and avoid adverse environmental impacts to the maximum extent possible. Part IV. Specifically, LDEQ authorized $NO_2$ emissions that will cause

NAAQS exceedances, but failed to evaluate the environmental harms of those exceedances. Part IV.A. Similarly, LDEQ failed to scrutinize cumulative air pollution impacts, despite evidence that nearby communities have disproportionate health risks from poor air quality. Part IV.B-C. Finally, LDEQ failed to require alternative project configurations that would mitigate environmental harms. Part IV.C.

Accordingly, vacatur is the appropriate remedy. Part V.

## ARGUMENT

## I.   Standard of Review

The circuits are split on the standard of review that applies here. One view is that "[f]ederal courts reviewing state agency action afford the agencies the deference they would receive under state law." *Township of Bordentown, N.J. v. FERC*, 903 F.3d 234, 270 (3rd Cir. 2018). The other is that the Federal Administrative Procedure Act's ("APA") arbitrary and capricious standard applies. *Appalachian Voices v. State Water Control Bd.*, 912 F.3d 746, 753 (4th Cir. 2019) (applying the federal APA to a Natural Gas Act challenge to the water quality certification issued by a state agency under the Clean Water Act). It does not appear that this Court has ruled on the issue, but it need not

be resolved here because the result would be the same under either

standard. *Friends of Buckingham v. State Air Pollution Control Bd.*, 947

F.3d 68, 81 (4th Cir. 2020) (recognizing that the APA and state

standards were virtually identical and applying general arbitrary and

capricious review).

Under Louisiana law, the court may reverse if an agency decision

is:

> (1)  In violation of constitutional or statutory provisions;
> (2)  In excess of the statutory authority of the agency;
> (3)  Made upon unlawful procedure;
> (4)  Affected by other area of law;
> (5)  Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion;
> (6)  Not supported and sustainable by a preponderance of evidence as determined by the reviewing court.

La. R.S. 49:978.1 (G) (re-designated from La R.S. 49:964 by Acts 2022,

No. 663, § 1). "Arbitrary and capricious means the absence of a rational

basis for the action taken." *Bowers v. Firefighters Ret. Sys.*, 2008–C–

1268 (La. 3/17/2009), 6 So. 3d 173 (citation and quotation marks

omitted). Courts will reverse an LDEQ decision where the decision was

23

reached "without individualized consideration" of the relevant factors or where the action was taken "without reason." *In re La. Dept. of Env't Permit No. 2560-00292-00 To Petroplex Int'l, LLC*, 2011 WL 1225871, *2 (La. App. 1 Cir. 3/25/2011) (unpublished). Under subsection (G)(6), the reviewing court "must make its own determination and reviewing of findings of fact by a preponderance of evidence, based on its own evaluation of the record in its entirety." La. R.S. 49:978.1(G)(6); *Multi– Care v. State, Dept. of Health & Hospitals*, 00–2001, p. 3 (La. App. 1st Cir. 11/9/01), 804 So.2d 673, 675; Holtzclaw, *To Defer or Not To Defer: The Standard of Review Regarding Administrative Rulings In The Appellate Courts of Louisiana*, 40 S.U. L. Rev. 435, 449-451 (Spring 2013).

Under the Federal Administrative Procedure Act, an agency must show it examined "the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). An agency decision is arbitrary if it has:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an

24

> important aspect of the problem, offered an
> explanation for its decision that runs counter to
> the evidence before the agency, or is so implausible
> that it could not be ascribed to a difference in view
> or the product of agency expertise.

*Id.* at 43 (1983).

Judicial review of an agency's factual findings or policy judgments under this standard is deferential, but is not "toothless." *Sw. Elec. Power Co. v. U.S. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). Regardless of the standard LDEQ's interpretation of federal law is entitled to no deference. *MCI Telecomm. Corp. v. Bell Atl. Pennsylvania,* 271 F.3d 491, 516 (3d Cir. 2001); *Township of Bordentown, N.J.*, 903 F.3d at 270; *Bowers*, 6 So.3d at 173 (agency is not entitled to deference in its interpretation of statutes and judicial decisions). And in fulfilling its public trust duty, LDEQ is required to make "findings supported by evidence" in the record, and must "articulate a rational connection between the facts found and the order issued." *Save Ourselves*, 452 So.2d at 1159.

While not identical, under either standard, the Court must determine whether LDEQ considered irrelevant factors, failed to evaluate an important factor, made a decision not supported by record

evidence, or failed to reasonably explain its decision. And Louisiana law is less deferential to LDEQ than this baseline. Here, LDEQ failed under either standard.

## II. LDEQ's Use of Significant Impact Levels to Determine the Project Would Not Cause or Contribute to a NAAQS Exceedance Was Arbitrary and Unlawful.

Before issuing the PSD permit, LDEQ needed to demonstrate that emissions from the proposed complex "will not cause, or contribute to" any NAAQS exceedances. 42 U.S.C. § 7475(a)(3); LAC 33:III.509.K.1. Accordingly, Commonwealth was required to perform an Air Quality Analysis that models its emissions impact along with other sources of air pollution. LAC 33:III.509.L.M; LAC 33:III.509.L.1 (analysis must comply with federal requirements); 40 C.F.R. pt. 51, App. W §§ 8.1, 8.3, 9.2 (analysis must include other sources of pollution). Where modeling shows a source would cause or contribute to a violation, LDEQ can only issue a permit if it requires mitigation. 40 C.F.R. § 51.165(b)(2).

Here, LDEQ's conclusion that Commonwealth would not cause or contribute to a NAAQS violation was arbitrary and contrary to law, for several reasons. First, Commonwealth wrongly exempted itself from performing an Air Quality Analysis for several criteria pollutants by

claiming its contribution to ambient levels of those pollutants would be below the SIL. Second, although Commonwealth performed an Air Quality Analysis showing $NO_2$ concentrations well over the NAAQS, AR10:41, AR71:40; AR37:119, LDEQ excused Commonwealth's culpability for those violations because its contribution was below the SIL. LDEQ's uncritical adoption of these analyses and its resulting failure to require Air Quality Analyses and mitigation renders its PSD permitting decision arbitrary.

A. LDEQ Unlawfully Failed to Require a Demonstration That Commonwealth Would Not Cause or Contribute to a NAAQS Violation for Multiple Pollutants.

It is undisputed that Commonwealth did not conduct a cumulative Air Quality Analysis for $SO_2$ (3-hour, 24-hour, and annual averaging periods), CO (1-hour and 8-hour), $PM_{10}$ (24-hour and annual averaging periods), or $PM_{2.5}$ (annual averaging period). AR10:20; AR71:37. Commonwealth and LDEQ wrongly claim that this analysis was not necessary because Commonwealth's impacts to concentrations of these pollutants would be below the relevant SIL. *See, e.g.*, AR10:20. This is prohibited by the Clean Air Act.

SILs "allow permitting authorities to automatically exempt sources with projected impacts below the SILs from having to make the demonstration required under 42 U.S.C. § 7475(a)(3), even in situations where the demonstration may require a more comprehensive air quality analysis." *Sierra Club I*, 705 F.3d at 465-66. The D.C. Circuit vacated those regulations because "EPA[] lack[s] … authority to exempt sources from the requirements of the Act." *Id.* This Court should similarly vacate LDEQ's application of the SILs here which suffers from the same fatal error as EPA's vacated SIL regulations.

Because the Clean Air Act uses such broad, sweeping language, it does not allow *de minimis* exceptions to an applicant's responsibility to demonstrate that it will not cause or contribute to a NAAQS violation. 42 U.S.C. § 7475(a)(3)(A)-(B). The term "contribute" "has no inherent connotation as to the magnitude or importance of the relevant 'share' in the effect; certainly it does not incorporate any 'significance' requirement." *Bluewater Network v. EPA*, 370 F.3d 1, 13 (D.C. Cir. 2004) (interpreting nearly identical language in another section of the Clean Air Act); *see also Catawba Cnty., N.C. v. E.P.A.*, 571 F.3d 20, 39 (D.C. Cir. 2009) (rejecting petitioners' claim that "the verb 'contribute'

28

necessarily connotes a significant causal relationship" where doing so would "interpret 'contribute' in a way that does such violence to section 107(d)'s very purpose"); *United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 7 (2008) ("no" means no). Instead, "'contribute' means 'to have a share in any act or effect,' or 'to have a part or share in producing.'" *Id.* (quoting Webster's Third New International Dictionary 496 (1993) and 3 Oxford English Dictionary 849 (2d ed.1989)). Thus, *any* contribution to *any* NAAQS exceedance violates the Clean Air Act, and LDEQ cannot circumvent the demonstration requirement because a contribution might be small.

That conclusion is underscored by Congress's use of expansive, mandatory language throughout Section 7475(a): "no" covered source may be constructed "unless" that source "demonstrates" that it "will not" "cause, or contribute to," "*any*" violation of the NAAQS (emphasis added). *See Ala. Power Co.*, 636 F.2d at 362; H.R. Rep. No. 95-294, at 9 (1977); S. Rep. No. 95-127, at 11, 32 (1977); *see also* 42 U.S.C. § 7475(a)(3). Congress specifically used the terms "cause" and "contribute" together to ensure the PSD program would prevent the NAAQS from being exceeded by considering all possible violations or

contributions to violations. *Ala. Power Co.*, 636 F.2d at 362. And, as shown by the repeated use of "any," the statutory mandate must be given broad sweeping effect. *See Consumer Electronics Ass'n v. FCC*, 347 F.3d 291, 298 (D.C. Cir. 2003) ("[T]he Supreme Court has consistently instructed that statutes written in broad, sweeping language should be given broad, sweeping application."); *see also Clintwood Elkhorn Mining Co.*, 553 U.S. at 7 ("Five 'any's' in one sentence and it begins to seem that Congress mean the statute to have expansive reach."); *Massachusetts v. EPA*, 549 U.S. 497, 528-29 (2007) ("repeated use of the word 'any'" demonstrated that statutory language was "sweeping" in its protective reach). This is the very sort of "rigid" statutory language that forecloses *de minimis* exemptions. *See Public Citizen v. Young*, 831 F.2d 1108, 1111-13 (D.C. Cir. 1987) (quoting statutory language whose "natural—almost inescapable—reading" requires certain action and finding that language is rigid).

Elsewhere in the Clean Air Act, Congress modified the word "contribution" with "significant." For example, Congress excluded from nonattainment areas portions of metropolitan areas where a state demonstrates sources "do not contribute significantly to a violation of

the [NAAQS]." 42 U.S.C. § 7407(d)(4)(A)(v); *see also* 42 U.S.C. § 7426(a)(1)(B) (limiting applicability of interstate pollution notification requirements to new sources that "significantly contribute to levels of air pollution in excess of the [NAAQS]"); 42 U.S.C. § 7547(a)(1), (4) (nonroad engine requirements apply only to mobile sources that "cause, or significantly contribute to, air pollution"). This further demonstrates that, with respect to section 7475(a)(3), Congress did not intend to limit the PSD demonstration requirement to only "significant contribution[s]." *Bluewater Network v. E.P.A.*, 370 F.3d at 14 ("[I]t is a general principle of statutory construction that when 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (quotation omitted). Such a *de minimis* exception also undermines the purpose of the PSD program to ensure careful consideration of a new source's potential impacts. 42 U.S.C. § 7470(5) (purpose of the PSD program "to assure that any decision to permit increased air pollution in any area to which this section applies is made only after careful evaluation of all the consequences of such a decision").

LDEQ cannot overcome this clear mandate. LDEQ relies heavily on EPA's SILs guidance, but that guidance cannot modify the Act's requirements. *See Medellin v. Bustos*, 854 F.2d 795, 799 (5th Cir. 1988) (a regulation "carries the force of law" and must be "give[n] effect" over an agency's guidance); *cf. Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 11 (D.C. Cir. 2002)) (statutes always overcome a conflicting regulation).

Nor do EPA's regulations providing that impacts *above* certain SILs necessarily cause or contribute to NAAQS violations support LDEQ's attempt to exempt impacts *below* the SILs. 40 C.F.R. § 51.165(b)(2); *Sierra Club I*, 705 F.3d at 465-66; *contra* AR71:33. And LDEQ does not, and cannot, identify support in Louisiana law because the SIP does not include SILs. *See* AR71:12 n.42; *In re Waste Management of Louisiana, LLC*, 2007 WL2377337, *4 (La. App. 1st Cir. 2007) (LDEQ cannot utilize provisions for PSD permitting not incorporated in the SIP).[7]

Here, Commonwealth did not even attempt—nor did LDEQ require it—to demonstrate that it would not cause or contribute to

---

[7] LDEQ has issued its own SILs guidance but that guidance is "currently under review" and LDEQ did not purport to use it here. AR71:37.

violations of the $SO_2$, CO, $PM_{10}$, or $PM_{2.5}$ NAAQS. LAC 33:III.509.K.1;

42 U.S.C. § 7475(a)(3). Because the Clean Air Act prohibits *de minimis*

exceptions, EPA and LDEQ lack the "authority to exempt sources from

th[is] [demonstration] requirement[] of the Act" by relying on the SILs

in this manner. *Sierra Club I*, 705 F.3d at 465-66. LDEQ's decision to

approve the PSD permit therefore violates the Clean Air Act.

B. Even if the Clean Air Act Allows Limited *De Minimis* Exceptions, the SILs Cannot Excuse Commonwealth's Contributions to the $NO_2$ NAAQS Exceedances Here.

With respect to $NO_2$, Commonwealth and LDEQ fabricate two

overlapping exceptions in an attempt to erase air quality analysis

demonstrating that the project *will* cause or contribute to a NAAQS

violation. They argue, with no legal basis, that "contribute" effectively

means "significantly contribute to the time and place of modeled

NAAQS exceedances." AR71:42 ("[T]he fact that the facility may result

in exceedances of the SIL is immaterial, as all such exceedances do not

occur at times and locations where AERMOD predicts exceedances of

the standard"). But where, as here, a source's impact does cause or

contribute to a modeled violation of the NAAQS, mitigation is required

before issuing a PSD permit. *See, e.g.*, 40 C.F.R. § 51.165(b)(2). LDEQ's

failure to do so here violates the Clean Air Act and renders its

permitting decision arbitrary.

> i. The $NO_2$ SIL Is Unavailable Because Air Quality Modeling Shows that the Project Area Is Violating the 1-hour $NO_2$ NAAQS.

Commonwealth's Air Quality Analysis reflects gross exceedances

of the NAAQS, with a maximum 1-hour $NO_2$ concentration of 229

$\mu g/m^3$. AR10:41; *see also* AR71:40 (LDEQ conceding that modeling

shows exceedances); AR37:119-27. That is well over the NAAQS of 188

$\mu g/m^3$. *See* AR71:13. As a result, *any* additional $NO_2$ impact in the area

will necessarily contribute to a NAAQS violation. *See supra* Section

II.A.

LDEQ cannot authorize such violations of the NAAQS. The Clean

Air Act directs states to include permit conditions necessary to "assure

compliance with all applicable requirements of the Act," 42 U.S.C. §

7661c(a), including attainment of the NAAQS.[8] NAAQS are set at a

level "requisite to protect the public health" with "an adequate margin

of safety," 42 U.S.C. § 7409(b)(1); *Whitman v. Am. Trucking Ass'ns*, 531

---

[8] States must likewise include in their SIPs provisions necessary to "meet the requirements of the" Act, including the NAAQS. 42 U.S.C. § 7410(a)(2).

U.S. 457, 476 (2001) (emphasis added). As a matter of law and fact, then, the NAAQS reflect the absolute pollution limit requisite to protect health.

Nevertheless, LDEQ has done precisely what it cannot do. LDEQ used the $NO_2$ SIL to allow Commonwealth to contribute to NAAQS exceedances. As even EPA guidance concedes, SILs cannot be used like this. AR75:10.

LDEQ attempts to discount these exceedances by claiming that the modeling may overestimate actual impacts. AR71:11-12. But neither Commonwealth nor LDEQ provide alternative estimates or any evidence demonstrating that these NAAQS violations will *not* occur. Although LDEQ asserts that the regional air quality monitor shows no exceedances, AR71:56, that monitor is 35 miles away, AR90:4-205, and only reflects operational sources, while the issue here relates to additional to-be-built, permitted sources that may cumulatively contribute to the NAAQS violation. The modeling is the best and only record evidence concerning Commonwealth's air impacts. And it is undisputed that the modeling shows numerous $NO_2$ NAAQS violations.

LDEQ's extensive reliance on EPA's 2018 SILs Guidance is misplaced. *See, e.g.*, AR71:12 n.42; AR75 (EPA's 2018 SILs Guidance). Guidance cannot overcome the Clean Air Act's statutory requirements. *Medellin*, 854 F.2d at 799. And EPA's 2018 SILs Guidance does not authorize LDEQ to disregard a demonstrated NAAQS violation by relying on the SILs. Instead, EPA specifically warned that SILs "may not be appropriate" or "may be misuse[d]" in situations where a NAAQS violation is threatened, e.g., where "a substantial portion of any NAAQS … is known to be consumed." AR75:11 (citing 75 Fed. Reg. 64864, 64892 and Memorandum from Stephen D. Page, EPA OAQPS, to EPA Regional Air Division Directors, "Guidance for $PM_{2.5}$ Permit Modeling," May 20, 2014 ("2014 SILs Guidance")). Here, Commonwealth's own modeling *demonstrated* a violation of the $NO_2$ NAAQS. Thus, Commonwealth fails the SILs test even under the SILs scheme envisioned by EPA.

Even if the $NO_2$ NAAQS violation does not categorically prohibit application of the SILs, Commonwealth's $NO_2$ impacts are not *de minimis*. AR71:42 ("That the Commonwealth LNG Project may result in $NO_2$ concentrations in excess of 7.5 µg/m$^3$ is not in dispute."). In fact,

36

Commonwealth's modeling shows a 1-hour average impact up to 37.7

µg/m³, well over the 7.5 µg/m³ SIL and nearly a quarter of the NAAQS.

AR 71:36. And independent modeling using Commonwealth's own

modeling inputs predicted a maximum $NO_2$ impact of 1,537 µg/m³,

approximately *eight times the NAAQS*, when the total geographical area

modeled is expanded consistent with EPA guidance. AR37:228. That

modeling also showed Commonwealth's $NO_2$ impact would exceed the 1-

hour SIL for $NO_2$ (7.5 µg/m³) *up to 40 km* from the project site. *Id.* at

231-32. It is undisputed the Commonwealth will contribute to these

modeled NAAQS violations. AR71:40.

Even under the SILs then, LDEQ could not issue Commonwealth's

PSD permit without requiring mitigation to offset Commonwealth's

$NO_2$ impacts. LDEQ's failure to do so renders its PSD permit arbitrary.

ii. LDEQ's "Time and Space" Restriction Violates the Clean Air Act and Cannot Erase Commonwealth's Contributions to These Modeled Violations.

LDEQ excused Commonwealth from mitigating these significant

$NO_2$ impacts by narrowing its reading of "contribute" even further—to

significant impacts at the specific time and place of those violations.

AR71:42. Relying on EPA's 2018 SILs Guidance and support

documents, LDEQ claims that this culpability framework is acceptable because impacts below the SILs are "not meaningful" and "indistinguishable from the inherent variability in the measured atmosphere." AR71:42.

As a legal matter, LDEQ's interpretation of "contribute" to mean "significantly contribute to the precise time and place of a modeled NAAQS violation" has no basis in the text of the Clean Air Act or Louisiana law. *See supra* Section II.A. This approach violates the Clean Air Act's broad prohibition on *any* contribution to a NAAQS violation and the plain statutory command requiring PSD permits to ensure compliance with the NAAQS. 42 U.S.C. § 7661c(a). And it contradicts the purpose and text of the PSD program. *See Alabama Power*, 636 F.2d at 362 ("[T]he emphatic goal of the PSD provisions is to prevent those thresholds from being exceeded."); H.R. Rep. No. 95-294, at 9 (1977), reprinted at 1977 U.S.C.C.A.N. 1077, 1087 ("The purpose of the permit is to assure that the allowable increments and [NAAQS] will not be exceeded as a result of emissions from any new or modified major stationary source.").

LDEQ's time-and-space SIL is further flawed for two basic reasons. First, even assuming that the attainment designation for the Cameron and Lake Charles areas is correct (and modeling suggests it is not), pollution increases below the SIL can still cause an area that is meeting the NAAQS to violate them. *See* 75 Fed. Reg. 64,864, 64,892-4. Commonwealth will cause an $NO_2$ impact of nearly one quarter of the NAAQS—a contribution that cannot be reasonably characterized as *de minimis* or trivial, even if its impacts at the "time and space" of a modeled NAAQS violation are below the SIL. And here, record evidence demonstrates that Commonwealth could, by itself, cause $NO_2$ concentrations nearly *eight times* the NAAQS. AR37:228. Although Commonwealth plainly could tip the area into nonattainment, LDEQ has arbitrarily and unlawfully excused it from offsetting its $NO_2$ emissions. *See* 40 C.F.R. § 51.165(b)(2); *see also* LAC 33:III.509.K. (requiring a major stationary source that contributes to the violation of the NAAQS to "reduce the impact of its emissions upon air quality by obtaining sufficient emission reductions to, at a minimum, compensate for its adverse ambient impact where the major source … would otherwise cause or contribute to a violation[.]").

Second, for areas that are already violating, or projected to violate, the NAAQS (like the Cameron area), any increase in $NO_2$ will compound the violation and make it harder to cure. Here, Commonwealth's modeling predicts a $NO_2$ concentration more than 21% higher than the NAAQS. AR71:40. That violation is well beyond any margin of error or inherent variability in the measured atmosphere. In addition, because LDEQ's approach allows unlimited numbers of sources to claim SIL exemptions, LDEQ is permitting multiple facilities that collectively contribute to massive exceedances of the NAAQS.[9] As a result, LDEQ's approach endorses rather than prevents significant deterioration of air quality.

LDEQ's decision to issue Commonwealth's PSD permit—despite Commonwealth's demonstrated exceedance of the $NO_2$ SIL and its contribution to a $NO_2$ NAAQS violation—was arbitrary and contrary to the Clean Air Act.

---

[9] *See* AR37:121 n.40 (collecting citations).

C.  LDEQ's Reliance on AP-42 Factors Further Undermined
    Its Application of the SILs.

Even if LDEQ's use of SILs was legally permissible, LDEQ's

reliance on AP-42 emissions factors factually undermined its SILs

analysis here. EPA explained that "*AP-42 emission factors should only*

*be used as a last resort*" because they "are not likely to be accurate

predictors of emissions from any one specific source." AR37:195

(emphasis in original). Yet, LDEQ allowed Commonwealth to rely

extensively on AP-42 emissions factors here, without any demonstration

that they were the best or only available option. *See, e.g.*, AR14:508-10.

Reliance on AP-42 factors fatally corrupts the Air Quality

Analysis underlying Commonwealth's NAAQS demonstration. As noted,

Commonwealth relied on the SILs to dodge refined air modeling for

impacts from multiple pollutants. Yet, some of the modeled impacts

were close enough to the SIL that a better calculation—based on more

accurate emissions factors—could have bumped the modeled impact

over the SILs threshold. For annual $PM_{2.5}$, for example, the modeled

impact of 0.169 $\mu g/m^3$ was only marginally below the SIL of 0.2 $\mu g/m^3$.

AR37:181; AR70:46. Yet, LDEQ allowed Commonwealth to rely on the

AP-42 emissions factor with a "D" rating for accuracy, without any

justification. *See, e.g.,* AR14:657, 661, 679 (showing reliance on AP-42

Table 1.4-2 for $PM_{2.5}$ emissions from thermal oxidizers and flares); Table

1.4-2 (listing the applicable factor ("PM (Total)") as receiving a "D"

rating). Similarly, for $NO_x$, Commonwealth relied on AP-42 emissions

factors with a "D" rating for accuracy. AR14:679 (referencing AP-42

Table 1.4-1 as the source for the thermal oxidizer $NO_x$ emissions factor);

Table 1.4-1 (listing the applicable factor as receiving a "D" rating).[10]

Relying on these factors undermined the accuracy of Commonwealth's

conclusions about the magnitude of its potential impacts and its

resulting conclusions that those impacts were below the SILs.

 LDEQ's attempts to defend reliance on AP-42 emissions factors

fail. AR71:118. First, LDEQ referenced outdated EPA guidance that

pre-date EPA's 2020 enforcement alert instructing state agencies to use

AP-42 as a last resort. Second, LDEQ's claim that source-specific data is

---

 [10] Available at

https://www3.epa.gov/ttnchie1/ap42/ch01/final/c01s04.pdf.

Commonwealth's application references the AP-42 emissions factors but

does not attach the full AP-42 table. Because the document is not

subject to reasonable dispute, it is appropriate for judicial notice.

*Swindol v. Aurora Flight Scis. Corp.*, 805 F.3d 516, 519 (5th Cir. 2015)

(citing Fed. R. Evid. 201(b)(2)).

not available and attempt to fault commenters for not providing alternative data points ignores that *Commonwealth and LDEQ* have the burden, not public commenters. 42 U.S.C. § 7475(a)(3) (No major emitting facility…may be constructed in any area to which this part applies unless…the owner or operator of such facility demonstrates" that it will not cause or contribute to a NAAQS violation."). Third, even if LDEQ is correct that source-specific data won't be available until Commonwealth comes online, LDEQ failed to acknowledge or justify its refusal to use AP-42 reported "maximum" emission rates, rather than "averages" that by definition fail to account for the maximum potential to emit. AR37:188. Record evidence establishes, for example, that relying on the reported "maximum" AP-42 emissions factor instead of the "average" would roughly *triple* Commonwealth's potential to emit annual $NO_x$ pollution. *Id.*

As a result of its arbitrary reliance on AP-42, Commonwealth failed to demonstrate that it will not cause or contribute to NAAQS violations or SILs exceedances for annual $PM_{2.5}$, $NO_x$, and other pollutants—even under LDEQ's SILs framework.

43

### III. LDEQ Failed to Ensure Compliance with BACT.

LDEQ must ensure that Commonwealth is "subject to best available control technology [BACT] for each" criteria pollutant. 42 U.S.C. § 7475(a)(4). BACT is an *"emissions limitation"* for each pollutant based on the *maximum degree of reduction,"* which LDEQ must determine on a case-by-case basis, accounting for "account energy, environmental, and economic impacts and other costs." LAC 33:III.509.B (emphasis added).

To determine BACT, applicants employ, and LDEQ ensures compliance with, a five-part, top-down analysis. AR02:272; AR70:7; *see also* AR93 at B.6-B.7 (EPA Guidance adopted by LDEQ). The applicant: (1) identifies all available control options for a given emissions unit; (2) evaluates the technical feasibility for each potential control option; (3) eliminates options that are not technically feasible; (4) ranks the remaining control options in descending order; and (5) evaluates each option, beginning with the most effective, ultimately selecting BACT. AR70:5-6.

While the applicant is not required to select the most effective control option or the lowest emission limit that option is capable of, the

applicant must justify selecting anything other than the most protective

available option. AR93:B.2. *ADEC v. EPA*, 540 U.S. 461 (2004). *See also*

*In re Masonite Corp.*, 5 E.A.D. 551, 566 (EAB 1994) (remanding PSD

permit, in part, because the BACT determination was based on an

incomplete cost-effectiveness analysis). Such a demonstration must be

thorough and well-documented. *Alaska Dep't of Envtl. Conservation v.*

*EPA*, 540 U.S. at 497.

Here, LDEQ failed to require emission limits consistent with

BACT for $NO_x$ emitted from two sources of pollution: (1)

Commonwealth's combustion turbines; and (2) Commonwealth's

oxidation system.

A. Commonwealth and LDEQ Failed to Require an Emission
   Limit Constituting the Maximum Degree of Reduction for
   $NO_x$ Emitted from the Combustion Turbines.

More than half of the total $NO_x$ emissions from the

Commonwealth facility, over 200 tons of $NO_x$ per year, will be emitted

by Commonwealth's nine natural gas fired combustion turbines. AR69:3

(table showing total emissions from the facility), 15-16 (table showing

$NO_x$ emissions from each turbine). It is undisputed that the most

effective technology to control $NO_x$ emissions from these combustion

turbines is installation of a selective catalytic reduction ("SCR") system paired with dry low $NO_x$ burners. AR2:277; AR70:12; AR71:83. All parties agree that installing this combination of controls is "achievable" here. LAC 33:III.509.B; 40 C.F.R. § 52.21(b)(12).

But Commonwealth and LDEQ nevertheless failed to propose a numerical emission limit constituting the "maximum degree of reduction" achievable by that technology. LAC 33:III.509.B; 40 C.F.R. § 52.21(b)(12). LDEQ approved a limit of 2.5 ppmvd. AR02:277. This limit assumes that the SCR system will eliminate only 90% of the $NO_x$ in the waste gas from the turbines. *Id.* But numerous facilities using these technologies have achieved a 2.0 ppmvd limit, a 20% lower limit than that proposed here. AR37:164-65. To achieve this, Commonwealth would only need to slightly increase the SCR's effectiveness, from 90% to 92%. *Id.* at 163.

Commonwealth acknowledged that a limit of 2.0 ppmvd is "achievable" using a combination of SCR and dry low $NO_x$ burners, which are "the top-ranked and most effective technologies." AR02:276-77, 316. Commonwealth nevertheless proposed, without explanation, a BACT limit of 2.5 ppmvd based on these technologies plus "the use of

clean fuels and good combustion practices." *Id.* at 277. Commonwealth did not even attempt to justify or explain its rejection of the lower numeric limit of 2.0 ppmvd. *See id.* Accordingly, Commonwealth failed to carry its burden to justify rejecting the more stringent $NO_x$ limit in favor of a less stringent one. R93:B.24 (applicant must "demonstrate" that a lower level of control is acceptable where a technology is capable of a higher level of control); *see also* AR93:B.2.

LDEQ's attempts to paper over this omission also fail for several reasons. First, LDEQ's general statements about the capabilities of SCR systems—*e.g.*, that SCR systems' efficiency is "dependent on many variables" or that, in certain circumstances, selecting something other than the most stringent level of control may be appropriate, AR71:80-82—fail to demonstrate why these standard efficiency levels are inappropriate *here.* LAC 33:III.509.B (requiring a "case-by-case" analysis); 40 C.F.R. § 52.21(b)(12).

Second, LDEQ's suggestion that using dry low $NO_x$ burners reduces the achievable efficiency of SCR systems, AR71:81, is contradicted by Commonwealth's admission that the 2.0 ppmvd limit is achievable, AR2:276-77, and by record evidence that numerous other

47

combustion turbines have achieved this 2.0 ppmvd limit using SCR systems paired with dry low $NO_x$ burners, AR37:164-65.

Third, LDEQ's dismissal of those other facilities is premised on a distinction without a difference. LDEQ asserted that the other examples are inapplicable because they are configured for combined-cycle operation while Commonwealth's turbines will be configured for simple-cycle operation. AR71:83. But Commonwealth explained that it would start up and shut down its combustion turbines infrequently. AR10:28. And LDEQ does not dispute, AR71:83, that, as a result, Commonwealth's turbines "should be able to meet the same $NO_x$ BACT limits that have been required for combustion turbines operated in combined cycle mode." AR37:164. Therefore, neither Commonwealth nor LDEQ have provided "source-specific factors or other relevant information that provide a technical, economic, energy or environmental justification" to overcome the presumption that Commonwealth can achieve the same 2.0 ppmvd reduction level as these other sources. AR93:B.24.

In short, the 2.5 ppmvd limit for $NO_x$ proposed by Commonwealth and uncritically accepted by LDEQ is not BACT. Instead, the emissions

48

limit that constitutes the "maximum degree of reduction" is 2.0 ppmvd. LAC 33:III.509.B; 40 C.F.R. § 52.21(b)(12). Accordingly, LDEQ has wrongly permitted an emission limit that is less stringent than required.

B. <u>LDEQ Failed to Require BACT for $NO_x$ Emissions from the Oxidation System.</u>

Separately, LDEQ also failed to require BACT for $NO_x$ emissions from the facility's oxidation system, which are devices that combust waste gas, including VOCs and toxic pollution. Here, Commonwealth proposed, and LDEQ approved, using thermal oxidizers to remove impurities from natural gas before liquefaction. AR2:303. At the same time, these thermal oxidizers produce emissions of various pollutants, including $NO_x$ and are subject to BACT.

Commonwealth failed to consider a different type of oxidation system—a catalytic oxidizer—which could result in lower overall $NO_x$ emissions, and has three benefits. *Compare* AR37:180 *with* AR2:303. First, it would reduce the amount of fuel necessary to operate the system, reducing Commonwealth's costs and reducing greenhouse gas emissions. *Id.* Second, the catalytic oxidizer's lower operating temperature reduces $NO_x$ development and, therefore, $NO_x$ emissions.

49

AR37:180; *see also* AR2:273 (more NO$_x$ is produced from combustion at higher temperatures). And third, the reduced exhaust temperature would allow the use of an SCR system, further reducing NO$_x$ emissions. *Id.* at 163, 180. Because it failed to consider an alternative that would further reduce emissions, Commonwealth failed to satisfy its burden to demonstrate BACT compliance. *Friends of Buckingham*, 947 F.3d at 72 (failure to consider an available control technology is "clear error."); AR93:B.2.

In an attempt to remedy this hole in the record, LDEQ wrongly asserted in its response to comments that the catalytic oxidizer option was not feasible because it "would needlessly add complexity to the system, would increase capital and operating costs, and would be an additional source of emissions." AR71:100. Each of these reasons fail.

First, added complexity does not render an alternative infeasible under the Clean Air Act or Louisiana law. Rather, "[a] demonstration of technical infeasibility should be clearly documented and should show, based on physical, chemical, and engineering principles, that technical difficulties would *preclude the successful use* of the control option on the emissions unit under review." AR93:B.7 (emphasis added). Even if

utilizing this combination of technologies would require some
adjustments to the Commonwealth facility, LDEQ failed to assert, let
alone justify, why those adjustments would preclude the successful use
of this control option here. LAC 33:III.509.B; 40 C.F.R. § 52.21(b)(12).

Second, LDEQ's general statements about increased costs are not
a substitute for actual cost estimates. To eliminate a control option
based on cost, LDEQ is required to perform a Cost/Economic Impacts
Analysis to quantify the costs and demonstrate that costs would be
impermissibly high. *See* AR93:B.31-B.32. Here, of course, such an
analysis could identify net *cost savings* from the reduced fuel
requirements. But, because LDEQ failed to perform the required
analysis, this alternative's impact on cost is unclear and LDEQ failed to
justify its rejection of this control option. *Town of Weymouth, Mass. v.
Mass. Dep't of Envt'l Prot.*, 961 F.3d 34, 44-45 (1st Cir. 2020) (lack of
cost calculations renders BACT determination arbitrary), *modified on
reh'g*, 973 F.3d 143 (1st Cir. 2020).

Third, LDEQ's claim that the other system adjustments would
represent "an additional source of air emissions" failed to quantify
ultimate emissions or account for the additional emission *reductions*

51

achieved via the catalytic oxidizer's lower operating temperature and ability to pair with an SCR system. Thus, LDEQ cannot claim that utilizing a catalytic oxidizer system would not reduce $NO_x$ emissions. *Id.* (control technology improperly rejected where there is insufficient record support); *In re Pennsauken Cnty., N.J., Res. Recovery Facility*, 2 E.A.D. 667, 672 (Adm'r 1988) (same).

In sum, LDEQ failed to perform the required analyses, and failed to establish that a lower BACT limit utilizing a catalytic oxidizer system combined with an SCR system is not "achievable" after taking into account "energy, environmental, and economic impacts and other costs." LAC 33:III.509.B; 40 C.F.R. § 52.21(b)(12). Because the agency failed to evaluate the relevant factors, the Court cannot uphold LDEQ's decision. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 42-43.

## IV.    LDEQ Violated Louisiana Code Section 30:2018 by Failing to Assess the Potential and Real Adverse Environmental Effects of the Proposed Commonwealth Facility and Whether Alternatives Could Avoid Those Impacts to the Maximum Extent Possible.

Before issuing any Clean Air Act permit for the construction of a major source like Commonwealth, LDEQ has an independent public

trustee duty to assess and avoid the "potential and real adverse environmental effects of the proposed permit activities" to the maximum extent possible, and evaluate "alternatives to the proposed activity which would offer more protection to the environment without unduly curtailing non-environmental benefits." La. R.S. 30:2014.A(4), 2018.B.1-3; *Save Ourselves*, 452 So. 2d at 1157; *see also* 40 C.F.R. § 52.970(c) (identifying EPA-approved SIP regulations, including LAC 33:III.101, which authorizes LDEQ's issuance of air permits "in accordance with La. R.S. 30:2001 *et seq*.").

Instead of fulfilling this duty, LDEQ committed two fundamental errors. First, LDEQ arbitrarily concluded that Commonwealth's facility "will not result in adverse impacts to the surrounding area," AR71:25, even though its air quality modeling predicts both that air quality in numerous locations affected by the facility's permitted emissions will violate health-based $NO_2$ standards, and that Commonwealth's emissions will sometimes consume more than 20% of the NAAQS. AR71:11; 10:41. LDEQ similarly concluded that Commonwealth's contribution to toxic and harmful particulate pollution was insignificant, even though the area surrounding Commonwealth is

already in the 80-90th percentile nationally for air toxics cancer risk, and the 70th percentile for particulate matter risk. AR71:27. Those conclusions were based on LDEQ's erroneous claim that technical compliance with the Clean Air Act's minimum standards is sufficient to avoid all adverse impacts. AR71:12. Second, LDEQ's arbitrary discounting of those potential adverse impacts affected the rest of the agency's decisionmaking, leading LDEQ to summarily dismiss cost-effective alternatives or mitigation measures that could reduce those impacts.

A. LDEQ Arbitrarily Relied on Technical Compliance with Regulatory Requirements to Support a Finding of No Adverse Impacts.

LDEQ short-circuited a meaningful public trustee evaluation by assuming that compliance with minimum air permitting requirements was the same thing as identifying and avoiding all potential adverse impacts to the maximum extent possible. That assumption is unfounded and contrary to law.

Louisiana law requires more than compliance with minimal air quality standards before making permitting decisions. The "cooperative federalism" structure of the Clean Air Act "expressly allow[s states] to

54

employ standards more stringent than those specified by the federal requirements." *Bell v. Cheswick Generating Station*, 734 F.3d 188, 190 (3d Cir. 2013) (citing 7 U.S.C. § 7416).

Louisiana's regulations ensure that required minimum federal requirements are met, *see* LAC 33:III.101 *et seq.*, but the state has also exercised its authority to impose additional requirements above and beyond that baseline. Specifically, Louisiana incorporated La. R.S. 30:2018.B.1-3—the public trustee requirement discussed above—into its federally-enforceable SIP. Thus, even when the Clean Air Act's minimum baseline requirements are met, LDEQ still has a duty to assess and avoid *all potential* adverse environmental and health impacts to the maximum extent possible.

Here, LDEQ arbitrarily assumed that compliance with baseline air quality standards was sufficient to ensure the absence of adverse air pollution impacts. That assumption is not only factually incorrect, but it impermissibly renders Louisiana's independent and federally-enforceable public trustee duty superfluous, in violation of fundamental rules of statutory interpretation. *BNSF Ry. Co. v. United States*, 775 F.3d 743, 754 (5th Cir. 2015) ("[W]e are bound by the canon that we

ought not 'interpret[ ] any statutory provision in a manner that would render another provision superfluous.'") (quoting *Bilski v. Kappos,* 561 U.S. 593, 607–08 (2010)).

LDEQ's public trustee obligations under La. R.S. 30:2001 *et seq.* must therefore be analytically distinct from the agency's obligations under the Clean Air Act's baseline permitting inquiry. Indeed, given LDEQ's independent responsibility to act as a representative of the broader public interest under La. R.S. 30:2001 *et seq.*, *Save Ourselves*, 452 So. 2d at 1157, the agency must evaluate whether potential cumulative or residual impacts warrant denying or modifying a permit, regardless of compliance with the Act's baseline permitting requirements. *Cf. Calvert Cliffs' Coordinating Comm. v. U. S. Atomic Energy Comm'n*, 449 F.2d 1109, 1122–23 (D.C. Cir. 1971) (cited approvingly in *Save Ourselves*, 452 So. 2d at 1157, and explaining that compliance with environmental standards does not obviate an agency's duty to fully and carefully consider the potential cumulative adverse impacts of pollution regulated under those standards).

B. **LDEQ Arbitrarily Relied on Minimum Permitting Requirements as Dispositive to Its Analyses of Potentially Adverse Impacts.**

As explained, compliance with baseline air permitting requirements does not obviate LDEQ's independent public trustee obligations. Instead, the first step of the public trustee analysis requires an assessment of all "potential and real adverse environmental effects" of its proposed decision, which includes an assessment of cumulative and residual health-related impacts. *Save Ourselves*, 452 So. 2d at 1157; *see also Matter of Dravo Basic Materials Co., Inc.*, CA-90-1525 (La. App. 1 Cir. 1992), 604 So. 2d 630, 635 ("[L]DEQ's inquiry is not limited to [a particular pollutant]," but must focus "on the entire activity," and "the effect of the [activity] on the environment in general"); *Matter of Am. Waste & Pollution Control Co.*, CA-92-1019 (La. Ct. App. 1993), 633 So. 2d 188, 191  (LDEQ's public trustee duty requires the agency to consider the whole picture). At the second step, LDEQ must avoid those impacts to the maximum extent possible, and determine whether there are measures that offer more protection to the environment without unduly curtailing non-environmental benefits. La. R.S. 30:2018.B.1-3. LDEQ erred at each step.

C. <u>LDEQ Arbitrarily Dismissed Known Adverse Health Risks from Exposure to NO$_2$, Air Toxics, and Particulate Matter.</u>

LDEQ's reliance on minimum permitting requirements as a substitute for its public interest obligation resulted in the arbitrary dismissal of known adverse health risks from exposure to nitrogen dioxide, air toxics, and particulate matter.

i. <u>Nitrogen Dioxide</u>

Commonwealth will emit substantial NO$_2$ pollution, which can cause or worsen "an array" of respiratory diseases such as asthma, particularly threatening children, the elderly, and other populations with higher asthma incidence, including the low-income and minority populations near the proposed facility. AR37:140-41; 75 Fed. Reg. 6474, 6480 (Feb. 9, 2010). NO$_2$ is also a precursor for particulate matter, which can separately cause significant respiratory illness and worsen diseases such as asthma, emphysema, and bronchitis, and lead to difficult or painful breathing. 75 Fed. Reg. at 6480. As discussed, undisputed air quality modeling predicts both that air quality in numerous locations affected by Commonwealth's permitted emissions will significantly and routinely exceed EPA's health-based NO$_2$ NAAQS,

AR71:11; AR10:41, and that the facility's emissions will sometimes consume more than 20% of the standard.

Nevertheless, LDEQ concluded that neither impact would be adverse because (1) Commonwealth's contribution to specific exceedances of the NAAQS would be below the SIL, and (2) at the times when Commonwealth caused pollution increases greater than the SILs, the model did not predict exceedances of the NAAQS. Each of those conclusions is violates LDEQ's public trust duty.

First, LDEQ fails to explain how exceedances of the health-based NAAQS do not result in potential adverse impacts to the communities surrounding Commonwealth. Regardless of the merits of using of EPA's SILs threshold for determining significance in the PSD permitting context, Commonwealth will indisputably make those $NO_2$ violations worse. And given those extent and frequency of those predicted violations, *any* incremental increase in ambient $NO_2$ will increase the health risks risk in the surrounding community. *See United States v. Ameren Mo.*, 421 F. Supp. 3d 729, 817-18 (E.D. Mo. 2019) ("Just as the NAAQS do not establish a 'zero-risk' threshold under which pollution is safe, the SILs do not establish a level below which there is no risk of

59

harm from a facility's pollution."), *rev'd in part on other grounds*, 9 F.4th 989 (8th Cir. 2021). Moreover, every incremental addition of pollution beyond the NAAQS will make it that much harder to correct any violation. LDEQ's claim that there is no potential adverse impact from those NAAQS violations is simply not credible.

Second, having adopted EPA's 7.5 $\mu g/m^3$ threshold for significance in the PSD context, LDEQ fails to explain why Commonwealth's 37.7 $\mu g/m^3$ $NO_2$ contribution does not have potentially adverse impacts, even when there is no technical violation of the NAAQS. The NAAQS "set *maximum* ambient air concentrations" requisite to protect the public health, *Catawba Cnty., N.C. v. E.P.A.*, 571 F.3d at 26 (emphasis added), they do not "definitively identify pollutant levels below which risks to public health are negligible." *American Trucking Ass'n v. EPA*, 283 F.3d 355, 369-70 (D.C. Cir. 2002). And in recommending the SILs, EPA did not purport to determine that a pollution increase of less than 7.5 $\mu g/m^3$ would not have measurable or important health impacts. Instead, EPA set the SILs at 4% of the $NO_2$ NAAQS simply because that is what EPA had done when setting levels for other pollutants, and because EPA

wanted to reduce administrative burdens.[11] Thus, while the NAAQS itself reflects EPA's judgment about the point at which cumulative pollution levels becomes unacceptably harmful, the SILs provides no similar information about the point at which incremental increases cause potential harm.

Nor do the SILs reflect any consideration of how additional pollution may exacerbate adverse air impacts in communities already overburdened by pollution impacts. EPA has recognized that low income and minority populations may be disproportionately susceptible to adverse environmental impacts, such that an impact could be "significan[t] to minority populations and low-income populations in the affected environment, despite having no significant impact to the general population."[12] But these factors played no role in LDEQ's analysis: the agency simply concluded that because impacts would not exceed the SILs at the same time and location of a predicted NAAQS

---

[11] 2010 SIL Guidance at 12; *see also Ameren Mo.*, 421 F. Supp. 3d at 818 (the SILs are a compliance demonstration tool to help applicants and permitting agencies).

[12] EPA, *Promising Practices for EJ Methodologies in NEPA Reviews*, at 34 (2016), https://www.epa.gov/sites/default/files/2016-08/documents/nepa_promising_practices_document_2016.pdf.

violation, there was no need for further inquiry. That was arbitrary. *See St. Tammany Par. Gov't v. Welsh*, 2015-1152 (La. App. 1 Cir. 3/9/16), 199 So. 3d 3, 1 (to "consider" potential adverse impacts, the agency must demonstrate that it "examined, deliberated about, pondered over, and inspected" the impacts).

     ii.  <u>Air Toxics and Particulate Matter</u>

Commonwealth's operation will also emit $PM_{2.5}$ and toxic air pollution that will have an adverse effect on human health. $PM_{2.5}$ is one of the deadliest air pollutants, in part, due to its ability to lodge deep in the lungs and cause acute respiratory cardiovascular illness, and even death. And exposure to toxic air pollutants emitted by Commonwealth, such as ammonia, formaldehyde, and benzene can cause eye, nose, and throat irritation, respiratory illnesses, central nervous system damage, birth defects, cancer, and premature death. AR71:55. Moreover, the facility will be located approximately two miles southwest of Cameron, a community with a large population of low-income and minority Louisianans that has been historically and disproportionately exposed to significant air and water pollution.

LDEQ concedes that the Cameron residents living within two miles of the proposed facility face greater air toxic cancer risks than 90%of the country, and a higher particulate matter risk than 70% of United States. AR71:27. Nevertheless, the agency incorrectly concluded that Commonwealth's contribution to toxic and harmful particulate pollution was insignificant, for two reasons. First, LDEQ points out that Commonwealth's particulate matter emissions are below the significant impact levels for the PM NAAQS. But as discussed above, *supra* Section IV.B, the SILs do not represent a level below which there will be no adverse impacts. *Cf. Am. Trucking Ass'ns, Inc. v. EPA*, 283 F.3d 355, 360 (D.C. Cir. 2002) (recognizing the "lack of a threshold concentration below which [particulate matter and ozone] are known to be harmless").

Second, LDEQ asserts that Commonwealth's toxic pollution does not raise the potential for adverse impacts because ethylene oxide emissions "contribute to 47 percent of the point source cancer risk" in the surrounding area, and Commonwealth is a minor source of toxic air pollutants and will not emit ethylene oxide. AR71:27-28. But the fact that another toxic air pollutant is responsible for some of the cancer risk in Cameron Parish does not mean that there are no "potential

adverse impacts" from harmful toxic air pollutants like ammonia, benzene, and formaldehyde. La. R.S. 30:2018. In fact, the EPA data cited by LDEQ, AR71:27 n.88, shows that formaldehyde represents nearly 70% of the air toxic risk in Cameron Parish. Regardless, given the existing $PM_{2.5}$ and air toxics cancer risks in the area—which LDEQ concedes—any increase in $PM_{2.5}$ or toxic air pollution will necessarily increase the risk of these adverse effects to the community, even if the minimum, baseline regulatory requirements are met. LDEQ has an obligation to consider the combined impacts of the proposed project, and it was arbitrary and capricious for LDEQ to ignore the potential cumulative adverse risks to human health from Commonwealth's air toxics and particulate matter emissions. *Matter of Dravo*, 604 So. 2d at 635 (La. 1st Cir. 1992) (LDEQ must consider the "entire activity," and its "effect … on the environment in general").

    D. <u>LDEQ Arbitrarily Rejected Alternatives that Would Have Reduced Environmental Impacts.</u>

    LDEQ's arbitrary dismissal of potential adverse impacts infected the rest of its public trustee analysis. Having concluded (incorrectly) that the Commonwealth project will meet minimum air permitting standards "that should ordinarily prevent adverse air quality impacts,"

AR71:12, the agency summarily and arbitrarily dismissed three feasible alternatives that could have reduced those adverse $NO_2$ and toxic air pollutant impacts. *Save Ourselves*, 452 So. 2d at 1157 ("An agency "must consider whether … mitigative measures would offer more protection … without unduly curtailing non-environmental benefits."); *see also In re Browning-Ferris Indus. Petit Bois Landfill*, 93-2050 (La. App. 1st Cir. 6/23/95), 657 So.2d 633, 639 (an agency may not restrict alternatives where such restrictions effectively yield one viable alternative). First, as discussed, Section II.B, LDEQ failed to consider a catalytic oxidizer as the best available control technology for Commonwealth's oxidization system. LDEQ does not dispute that such a control technology is technically feasible, and would reduce the facility's $NO_2$ and toxic air pollutants emissions.

Second, LDEQ also summarily rejected the use of a more efficient on-site, combined-cycle power plant to generate electricity coupled with a more efficient SCR system, which would reduce harmful $NO_2$ pollution from the facility. As approved, the Commonwealth facility will rely on six simple-cycle refrigeration turbines to liquefy natural gas for transport, and three simple-cycle combustion turbines to generate the

electricity for the facility. AR14:351. Those three simple-cycle electric generating units would be responsible for significant $NO_2$ pollution. *See* AR14:17 (permitted emissions table). These emissions could be reduced if the three simple-cycle electric generators were replaced with more efficient, combined-cycle generators, which burn gas to generate electricity directly and reuse the heat from the turbine exhaust to generate additional electricity. AR37:163-69. This means that a combined-cycle plant can produce the same amount of electricity while burning less gas and producing less pollution.

LDEQ did not dispute that combined-cycle electric generating units coupled with SCR controls are technically and economically feasible, and capable of achieving 99% $NO_2$ removal efficiency, significantly better than the 60-90% removal efficiency with Commonwealth's planned simple cycle combustion turbine. *Compare* AR37:163-65 *with* AR71:83 (noting lower emission limits are achievable with combined-cycle units). Nevertheless, LDEQ arbitrarily rejected the combined-cycle alternative based on speculation that it would require an increase in the footprint for the plant. AR71:95.

Nothing in the record supports LDEQ's claim that a combined-cycle generator requires any more space than Commonwealth already has planned for the facility. Although LDEQ asserts that a combined-cycle generator would require a 100-acre footprint, AR71:95, there is nothing in the record directly comparing that footprint to the already-proposed 135.4-acre footprint for the Commonwealth facility with simple-cycle generators. Nor does LDEQ explain how a 393-acre property is insufficient to site a combined-cycle generator, even if it did require 100 acres.

Even if the record supported LDEQ's assertion that combined-cycle electricity generation would require *some* additional space or wetlands impact, AR71:95, LDEQ failed to quantify or explain *how* those purportedly adverse impacts outweighed the benefits of reduced air pollution in an area that is already predicted to violate healthy air quality standards. Merely pointing out that an admittedly feasible alternative presents tradeoffs, rather than being purely beneficial, is not enough.

Finally, LDEQ similarly rejected the potential use of electric motor-driven compressors as a means to liquefy natural gas, AR71:8,

even though such technology is feasible and would significantly reduce air pollution in the immediate vicinity of the plant. AR37:174-75. LDEQ did not dispute Sierra Club's assertion that electric engines are more efficient, would lower noise levels compared to gas-fired engines, and significantly reduce harmful emissions from the facility itself, including emissions of $NO_2$ and toxic air pollutants. *Id.* Indeed, using electric-drive motors would virtually eliminate on-site emissions associated with the liquefaction process. Instead, the agency asserted that the primary source of grid-sourced electricity would be Entergy Louisiana's Roy S. Nelson coal-burning power plant, so it is not clear that electric motors "would reduce overall project emissions." AR71:93-94. LDEQ further asserted that the construction of a 29.3-mile transmission line would be required, which would be vulnerable to extreme weather and would "impact additional wetlands." *Id.*

Neither argument is availing. First, grid-based electricity is "increasingly generated from renewable sources such as wind and solar," *Id.*, which have no emissions. Moreover, LDEQ neither quantifies the supposed increase in emissions from the Nelson power plant, nor explains how those emissions (which would occur many miles

68

away) outweigh the benefits to air quality in the communities immediately surrounding Commonwealth from virtually eliminating emissions from the liquefaction generators. Second, LDEQ similarly fails to quantify the costs associated with constructing a transmission line, or the amount of wetlands that could be impacted. Nor does the agency explain why extreme weather heavily weighs against constructing a transmission line, but not against constructing and operating nine combustion turbines in the same location. As with the potential use of combined-cycle generators, LDEQ cannot disregard reasonable and technically feasible alternatives based on a conclusory assertion that each alternative would increase other environmental impacts. To demonstrate that the agency has avoided adverse environmental impacts to the maximum extent possible, LDEQ must provide enough information to meaningfully evaluate whether these tradeoffs outweigh the reduction in adverse air pollution.

## V.    Vacatur Is the Appropriate Remedy Under State or Federal Law.

Under Louisiana law, "if the decision was reached procedurally, without individualized consideration and balancing of environmental factors conducted fairly and in good faith, it is the courts' responsibility

to reverse." *Save Ourselves, Inc.*, 450 So.2d at 1159. This is exactly what LDEQ has done here. LDEQ arbitrarily utilized SILs to avoid required air quality analyses and mitigation. It failed to establish BACT for multiple sources of emissions. And it failed to satisfy its independent responsibility as public trustee for the environment. In short, LDEQ's permitting decision was arbitrary, not supported by a preponderance of evidence, and violated the Louisiana Constitution, and this Court should reverse. La. R.S. 49.978.1(G).

Similarly, under the APA, "[t]he default rule is that vacatur is the appropriate remedy." *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022) (citations omitted). This Court only departs from the default rule only where there is a high likelihood that the agency will justify its decision on remand and where vacatur would cause significant disruption. *Texas v. Biden*, 20 F.4th 928, 1000 (5th Cir. 2021), *rev'd on other grounds*, 142 S. Ct. 2528 (2022).

Here, both factors counsel vacatur. First, LDEQ is unlikely to be able to substantiate the same decision on remand. LDEQ cannot rely on SILs to avoid requiring (1) Commonwealth to demonstrate it will not contribute to a violation of the $SO_2$, , $PM_{10}$, or $PM_{2.5}$ NAAQS; or (2)

mitigation for Commonwealth's NO₂ emissions that will contribute to a NAAQS violation. Thus, on remand, LDEQ would, at a minimum, require significant NO₂ mitigation, fundamentally changing the permit. Moreover, LDEQ cannot permit the same lax NO₂ emissions limits because BACT requires more stringent limits. Finally, . to satisfy its public trust obligations, LDEQ cannot reissue the permit without evaluating and avoiding all potential health harms to the maximum extent possible. Vacatur is appropriate because, on this record, LDEQ's permit decision cannot be substantiated.

Second, vacatur would not be disruptive. As Commonwealth concedes, "[c]onstruction has not commenced for the" project.[13] Moreover, the project is not even fully permitted,[14] and therefore vacatur would not disrupt or not meaningfully delay construction.

---

[13] Commonwealth LNG LLC, Docket Nos. CP-19-502-000, -001 Monthly Status Report 2, at 3 (Sep. 1, 2023), Accession 20230901-5008. This document, which is not subject to reasonable dispute, is appropriate for judicial notice. *Swindol*, 805 F.3d at 519. Additionally, the Court may consider extra-record evidence when determining remedy. *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989).

[14] Commonwealth's Clean Water Act Section 404 permit, which is required before Commonwealth commences construction impacting wetlands, is still pending. Commonwealth LNG LLC, Major Permits,

Because it is the only remedy that would serve the Clean Air Act's fundamental purpose of preventing significant deterioration of air quality and the Louisiana Constitution's fundamental purpose of environmental protection, this Court should vacate LDEQ's decision to permit the Commonwealth project.

## CONCLUSION

Sierra Club respectfully requests that this Court vacate and remand the Commonwealth air permits.


Dated: September 13, 2023

---

Approvals, and Consultations for the Commonwealth LNG Project September 2023, Accession 20230901-5008.

Respectfully submitted,

*s/ Thomas Gosselin*
Thomas Gosselin
Sierra Club
P.O. Box 4998
Austin, TX 78765
Telephone: (424) 346-3276
tom.gosselin@sierraclub.org
*Attorney for Sierra Club*

Joshua Smith
Sierra Club
2101 Webster St, Suite 1300
Oakland, CA 94612
Telephone: (415) 977-5560
joshua.smith@sierraclub.org
*Attorney for Sierra Club*

Louisa Eberle
Sierra Club
1536 Wynkoop St., Ste. 200
Denver, CO 80202
Telephone: (415) 977-5753
louisa.eberle@sierraclub.org
*Attorney for Sierra Club*

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2023, I electronically filed the foregoing Initial Brief of Petitioners with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

<u>s/ ***Thomas Gosselin***</u>
Thomas Gosselin

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32, I certify that this brief complies with:

1) the type-volume limitations of Rule 32(a)(7) because it contains 12,989 words, excluding the parts of the brief exempted by Rule 32(f); and

2) the typeface and type style requirements of Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface (14-point) using Microsoft Word (the same program used to calculate the word count).

s/ ***Thomas Gosselin***
Thomas Gosselin

## CERTIFICATE OF ELECTRONIC COMPLIANCE

I further hereby certify that in the foregoing brief filed using the Fifth

Circuit CM/ECF document filing system, (1) the privacy redactions

required by Fifth Circuit Rule 25.2.13 have been made, and (2) the

electronic submission is an exact copy of the paper document.


s/ ***Thomas Gosselin***
Thomas Gosselin