**No. 23-60234**

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

SIERRA CLUB

PETITIONERS

V.

LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY;
ROGER W. GINGLES, IN HIS OFFICIAL CAPACITY AS SECRETARY, LOUISIANA
DEPARTMENT OF ENVIRONMENTAL QUALITY

RESPONDENTS

---

ON PETITION FOR REVIEW OF ORDERS OF THE LOUISIANA DEPARTMENT
OF ENVIRONMENTAL QUALITY

---

**BRIEF OF INTERVENOR COMMONWEALTH LNG, LLC**

---

Beth Bivans Petronio
**K&L GATES LLP**
1717 Main Street, Suite 2800
Dallas, Texas  75201
Beth.petronio@klgates.com

Ankur K. Tohan
Washington State Bar No. 36752
ankur.tohan@klgates.com
**K&L Gates LLP**
925 Fourth Avenue, Suite 2900
Seattle, Washington 98104
Telephone: (206) 370-7658

**ATTORNEYS FOR INTERVENOR**

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

In accordance with <u>Federal Rule of Appellate Procedure 26.1</u> and Fifth Circuit Rule 28.2.1, the undersigned counsel of record certifies that the following listed persons and entities have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. **Sierra Club**, Petitioner, represented by:

> Thomas Gosselin
> Joshua D. Smith
> Louisa Eberle
> Sierra Club

2. **Louisiana Department of Environmental Quality**, Respondent, represented by:

> Jeff Landry
> Elizabeth Baker Murrill
> Shae McPhee
> Office of the Louisiana Attorney General

3. **Roger Gingles, in his official capacity as Secretary, Louisiana Department of Environmental Quality**, Respondent, represented by:

> Courtney Burdette
> Jill Carter Clark
> Ashley Plunkett
> Louisiana Department of Environmental Quality

4. **Commonwealth LNG, LLC**, permittee and proposed Respondent-Intervenor, represented by:

> Beth Petronio
> Ankur Tohan
> K&L Gates LLP

Commonwealth LNG, LLC is a Texas limited liability company that is a wholly-owned subsidiary of Commonwealth Projects, LLC, which is wholly-owned by a private individual, Paul Varello.

*/s/ Beth Bivans Petronio*
Beth Bivans Petronio

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Given that the applicable standard of review requires substantial deference to the Louisiana Department of Environmental Quality's exercise of discretion in connection with the issuance of an air quality permit, Commonwealth LNG, LLC does not believe that oral argument is required.  If the Court does schedule this matter for oral argument, Commonwealth LNG, LLC would like the opportunity to present argument.

# TABLE OF CONTENTS

**CERTIFICATE OF INTERESTED PERSONS** ..................................................... i

**STATEMENT REGARDING ORAL ARGUMENT** ........................................ iii

**TABLE OF CONTENTS** ................................................................... iv

**TABLE OF AUTHORITIES** ............................................................... vi

**JURISDICTIONAL STATEMENT** ........................................................ 1

**STATEMENT OF ISSUES** ................................................................ 2

**STANDARD OF REVIEW** ................................................................ 3

**STATEMENT OF FACTS** ................................................................. 6

    **A.  COMMONWEALTH'S CAMERON PARISH PROJECT** ............................... 6

    **B.  THE NGA GOVERNS COMMONWEALTH'S PROJECT** ............................. 6

    **C.  COMMONWEALTH'S APPLICATION TO FERC AND FERC AUTHORIZATION** ............................................................. 9

    **D.  LDEQ'S REVIEW OF THE PERMIT APPLICATION** ............................. 10

    **E.  LDEQ ISSUES THE PERMIT** ................................................ 10

**SUMMARY OF ARGUMENT** ............................................................ 11

**ARGUMENT** ............................................................................. 14

    **A.  THE COURT HAS EXCLUSIVE JURISDICTION OVER THIS APPEAL PURSUANT TO THE NATURAL GAS ACT** ....................................... 14

    **B.  LDEQ'S USE OF SIGNIFICANT IMPACT LEVELS WAS PROPER** ............. 25

        **(1)  Significant Impact Levels ("SILs") Have Long Been Used by the EPA and LDEQ** ........................................ 25

(2) Commonwealth Conducted a Thorough Air
Quality Analysis ................................................................30

(3) Sierra Club's Challenges to LDEQ's Use of SILs are Not
Warranted ........................................................................31

    a) LDEQ Properly Concluded Additional Air
Quality Modeling was not necessary for
certain pollutants that fell below SILs....................................31

    b) LDEQ's Use of SILs for NO₂ Was Also Proper......................36

    c) LDEQ's Reliance of AP-42 Factors Was Justified.................39

C. LDEQ'S BACT ANALYSIS WAS PROPER ................................40

(1) LDEQ Properly Analyzed BACT for Commonwealth's
combustion turbines ........................................................42

(2) LDEQ properly permitted the use of thermal oxidizers as BACT
................................................................................44

D. SIERRA CLUB'S ARGUMENTS REGARDING LOUISIANA'S PUBLIC
TRUSTEE DOCTRINE SHOULD BE REJECTED BY THIS COURT ...............46

E. IF THE COURT GRANTS ANY FORM OF RELIEF, IT SHOULD REMAND
WITHOUT VACATUR. ...........................................................56

CONCLUSION.......................................................................57

CERTIFICATE OF SERVICE .....................................................59

CERTIFICATE OF COMPLIANCE ...............................................60

ECF CERTIFICATION .............................................................61

# TABLE OF AUTHORITIES

CASES

*Alaska Dep't of Env't Conservation v. E.P.A.,*
  540 U.S. 461 (2004) .................................................................. 9, 40, 42

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993)....................................................... 56, 57

*Ammex, Inc. v. Wenk,*
  936 F.3d 355 (6th Cir. 2019) ......................................................... 17, 21

*Basinkeeper v. U.S. Army Corps of Eng'rs,*
  715 F. App'x 399 (5th Cir. 2018)..........................................................57

*BCCA Appeal Grp. v. U.S. E.P.A.,*
  355 F.3d 817 (5th Cir. 2003) ............................................................. 8, 15

*Black Oak Energy, LLC v. FERC,*
  725 F.3d 230 (D.C. Cir. 2013)..............................................................57

*Blackett v. La. Dep't of Env't Quality,*
  506 So.2d 749 (La. App. 1st Cir.1987) .................................................50

*Bluewater Network v. E.P.A.,*
  370 F.3d 1 (D.C. Cir. 2004)..................................................................35

*California Dump Truck Owners Ass'n v. Nichols,*
  784 F.3d 500 (9th Cir. 2015) ...............................................................17

*Catawba County v. E.P.A.,*
  571 F.3d 20, 35 (D.C. Cir. 2009)..................................................... 33, 34

*Cent. & S. W. Servs., Inc. v. U.S. E.P.A.,*
  220 F.3d 683 (5th Cir. 2000) ......................................................... 56, 57

*Chevron U.S.A. Inc. v. Nat. Res. Def. Council,*
  467 U.S. 837 (1984) ...........................................................................34

*Council of Commuter Orgs. v. Metro. Transp. Auth.,*
  683 F.2d 663 (2d Cir. 1982) ................................................................18

*Delaware Riverkeeper Network v. Sec. Penn. Dep't of Env't Prot.*,
    833 F.3d 360 (3d Cir. 2016) .................................................................. passim

*Dominion Transmission, Inc. v. Summers*,
    723 F.3d 238 (D.C. Cir. 2013), *judgment entered*,
    529 Fed. Appx. 3 (D.C. Cir. 2013) ..................................................... 15

*Dow Chemical Co. La. Operations Complex Cellulose and*
    *Light Hydrocarbons Plants, Part 70 Air Permit Major Modifications*
    *and Emission v. Reduction Credits*,
    885 So. 2d 5 (La. App. 2004) ........................................................ 4, 52

*Env't Def. Fund v. E.P.A.*,
    82 F.3d 451 (D.C. Cir.), *amended on other grounds by*
    92 F.3d 1209 (D.C. Cir. 1996) ......................................................... 33

*Env't Integrity Project v. U.S. E.P.A.*,
    969 F.3d 529 (5th Cir. 2020) ...................................................... 19, 29

*Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*,
    968 F.3d 357 (5th Cir. 2020), *as revised*, (Aug. 3, 2020),
    *and following remand*, 47 F.4th 408 (5th Cir. 2022),
    *and reh'g en banc granted, vacated*, 61 F.4th 1012 (5th Cir. 2023) .................... 17

*Friends of Buckingham v. State Air Pollution Control Bd.*,
    947 F.3d 68 (4th Cir. 2020) ............................................................. 19

*Gossen v. Welsh*,
    2016 LEXIS 213 (La. App. 1st Cir. 2016) .......................................... 52

*Groce v. Dept. of Env't Prot.*,
    921 A.2d 567 (Pa. Commw. Ct. 2007) ............................................. 35

*Grp. Against Smog & Pollution, Inc. v. Shenango Inc.*,
    810 F.3d 116 (3d Cir. 2016) ............................................................. 17

*Gunn v. Minton*,
    568 U.S. 251 (2013) ......................................................................... 23

*In re Dep't of Env't Quality Permitting Decision*,
    2011 WL 1225871 (La. App. 1st Cir. 2011) ..................................... 53

*In Re Newmont Nev. Energy Inv., LLC. TS Power Plant,*
    PSD Appeal No. 05-04, December 21, 2005 (EPA E.A.B.) .................................43

*In re Pennsauken Cnty., N.C. , Res. Recovery Facility,*
    2 E.A.D. 667 (Adm'r 1988).................................................................................46

*In re Shintech, Inc.,*
    814 So.2d 20 (La. App. 1st Cir. 2002), *writ denied,*
    815 So.2d 845 (La. 2002) ....................................................................................52

*In the Matter of Am. Waste and Pollution Control Co.,*
    633 So.2d 188 (La. App. 1st Cir.1993) ...............................................................50

*Indiana v. E.P.A.,*
    796 F.3d 803 (7th Cir. 2015) ...............................................................................17

*Islander East Pipeline Co. v. Conn. Dep't of Env't Prot.,*
    482 F.3d 79 (2d Cir. 2006) ...................................................................................15

*Joseph v. Sec'y of Nat. Res.,*
    265 So. 3d 945 (La. App. 5th Cir. 2019)..............................................................52

*Jurisich v. Jenkins,*
    749 So. 2d 597 (La. 1999) ....................................................................................53

*La. Env'tl Soc'y, Inc. v. Dole,*
    707 F.2d 116 (5th Cir. 1983) ..................................................................................4

*Luminant Generation Co. v. E.P.A.,*
    675 F.3d 917 (5th Cir. 2012) ....................................................................... 8, 9, 15

*Maryland v. E.P.A.,*
    958 F.3d 1185 (D.C. Cir. 2020)...........................................................................42

*Matter of Rubicon Inc.,*
    670 So. 2d 475 (La. App. 1st Cir. 1996)..............................................................49

*Michigan v. E.P.A.,*
    268 F.3d 1075 (D.C. Cir. 2001)...........................................................................16

*Nat. Min. Ass'n v. U.S. E.P.A.*,
    59 F.3d 1351 (D.C. Cir. 1995) ...................................................................17

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005) ...................................................................34

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
    53 F.4d 869 (5th Cir. 2022) ...................................................................24

*Normand v. Wal-Mart.com USA, Inc.*,
    340 So. 3d 615 (La. 2020) ...................................................................32

*North Carolina v. E.P.A.*,
    550 F.3d 1176 (D.C. Cir. 2008) ...................................................................56

*North Carolina v. Tenn. Valley Auth.*,
    615 F.3d 291 (4th Cir. 2010) ...................................................................17

*Osborn v. Bank of U.S.*,
    22 U.S. (9 Wheat.) 738 (1824) ...................................................................19

*Save Our Hills v. La. Dept. of Env't Quality*,
    266 So. 3d 916 (La. App. 2018) ...................................................... 3, 4, 53

*Save Ourselves, Inc. v. La. Environ. Con. Comm'n*,
    452 So. 2d 1152 (La. 1984) ...................................................... passim

*Schneidewind v. ANR Pipeline Co.*,
    485 U.S. 293 (1988) ...................................................................15

*Shrimpers and Fishermen of RGV v. Tx. Comm. Of Env't Quality*,
    968 F.3d 419 (5th Cir. 2020) ...................................................................22

*Sierra Club v. E.P.A.*,
    939 F.3d 649, 680 (5th Cir. 2019) ...................................................................33

*Sierra Club v. E.P.A.*,
    955 F.3d 56 (D.C. Cir. 2020) ...................................................................28

*Sierra Club v. State Water Control Bd.*,
    64 F.4th 187 (4th Cir. 2023) ...................................................... 20, 21

*Sierra Club v. U.S. E.P.A.*,
  496 F.3d 1182 (11th Cir. 2007) ...................................................17

*St. Tammany Par. Gov't v. Welsh*,
  199 So. 3d 3 (La. App. 1st Cir. 2016) ...........................................54

*Talarico Bros. Building Corp. v. Union Carbide Corp.*,
  73 F.4th 126 (2d Cir. 2023) .........................................................33

*Texas v. E.P.A.*,
  983 F.3d 826 (5th Cir. 2020) .......................................................34

*Texas v. U.S. E.P.A.*,
  690 F.3d 670 (5th Cir. 2012) ................................................ 16, 22

*Tex. Comm'n on Env't Quality v. Vecinos Para
  El Bienestar De La Comunidad Costera,*
  No. 03-21-00395-CV, 2023 WL 4670340,
  (Tex. App.—Corpus Christi, July 21, 2023) ............................ 1, 18, 19

*Town of Weymouth v. Mass. Dep't of Env't Prot.,*
  961 F.3d 34 (1st Cir.), *on reh'g*, 973 F.3d 143 (1st Cir. 2020).................. passim

*Traigle v. PPG Indus.,*
  332 So. 2d 777 (La. 1976) .................................................... 32, 33

*Train v. Nat. Res. Def. Council, Inc.*,
  421 U.S. 60 (1975) ........................................................................8

*Twp. of Bordentown, New Jersey v. Fed. Energy Regul. Comm'n,*
  903 F.3d 234 (3d Cir. 2018) ..........................................................3

*U.S. v. General Motors Corp.*,
  876 F.2d 1060 (1st Cir. 1989) .....................................................18

*Union Elec. Co. v. E.P.A.*,
  515 F.2d 206 (8th Cir.1975), *aff'd*, 427 U.S. 246 (1976) ...................18

*Utah Physicians for Healthy Env't v. Diesel Power Gear, LLC,*
  21 F.4th 1229 (10th Cir. 2021) ...................................................17

*Util. Air Regulatory Grp. v. E.P.A.*,
   573 U.S. 302 (2014). ..............................................................................16

*Zen-Noh Grain Corp. v. Consol. Env't Mgmt., Inc.*,
   No. CIV.A. 12-1011, 2012 WL 6201871 (E.D. La. Dec. 12, 2012),
   *amended on denial of reconsideration*, No. CIV.A. 12-1011,
   2013 WL 3947186 (E.D. La. July 31, 2013)........................................................41


STATUTES

5 U.S.C. §§ 701 *et seq.*....................................................................................4

15 U.S.C. § 717b ............................................................................... 7, 9, 15

15 U.S.C. § 717b-1 ................................................................................7

15 U.S.C. § 717f................................................................................7

15 U.S.C. § 717r................................................................................ passim

15 U.S.C. §§ 717-717w ................................................................................6

42 U.S.C. §§ 4321 *et seq.*................................................................................7

42 U.S.C. § 7172 ................................................................................7

42 U.S.C. §§ 7401 *et seq.*................................................................ passim

42 U.S.C. § 7407 ................................................................................8

42 U.S.C. §§ 7408 ................................................................................8

42 U.S.C. § 7409 ............................................................................... 8, 25

42 U.S.C. § 7410 ................................................................................ passim

42 U.S.C. § 7411 ................................................................................16

42 U.S.C. § 7413 ................................................................................25

42 U.S.C. § 7470 ............................................................................... 25, 35

42 U.S.C. § 7471 ..................................................................................25

42 U.S.C. § 7475 ................................................................. 24, 26, 40

42 U.S.C. § 7502 ..................................................................................35

42 U.S.C. § 7503 ..................................................................................35

42 U.S.C. § 7661a ................................................................................22

42 U.S.C. § 7661d ...............................................................................24

La. R.S. 30:1051 *et seq* ...................................................................48

La. R.S. 30:1062 ..................................................................................48

La. R.S. 30:1066 ..................................................................................48

La. R.S. 30:2018 ..................................................................................50

La. R.S. 30:2050.21 ...............................................................................3

La. R.S. 49:978.1 ...............................................................................3, 4

LAC 33:III.509 ........................................................................... passim

O<small>THER</small> A<small>UTHORITIES</small>

43 Fed. Reg. 26,388, 26,398 (June 19, 1978) .........................................26

52 Fed. Reg. 24,672, 24,713 (July 1, 1987)............................................27

Emissions Estimation Protocol for Petroleum Refineries,
   Version 3, April 2015 (p. 4-11) (https://www.epa.gov/sites/default/files/2020-1
   1/documents/protocol_report_2015.pdf). ...........................................39

EPA, Significant Impact Levels for Ozone and Fine Particles,
   https://www.epa.gov/nsr/significant-impact-levels-ozone-and-fine-particles. .....26

Jacob Dweck, David Wochner & Michael Brooks, *Liquefied Natural Gas (LNG) Litigation After the Energy Policy Act of 2005: State Powers in LNG Terminal Siting*, 27 ENERGY L.J. 473, 474 (2006) ..................................................................7

La. Const. art. IX § 1 ........................................................................... 47, 48

MARK HOLT & CAROL GLOVER, CONG. RESEARCH SERV., RL33302, ENERGY POLICY ACT OF 2005: SUMMARY AND ANALYSIS OF ENACTED PROVISIONS 20 ......7

Mem. From Richard G. Rhoads, Office of Air Quality Planning & Standards, to Alexandria Smith, EPA Region X, "Interpretation of 'Significant Contribution'" (Dec. 6, 1980) at 1, https://www.epa.gov/sites/production/files/2015-07/documents/reaffirm.pdf. ..................................................................26

## REGULATIONS

40 C.F.R. § 50.2 ..............................................................................25

40 C.F.R. § 51.160 ...........................................................................16

40 C.F.R. § 51.165 ...........................................................................27

40 C.F.R. § 52.21 .............................................................................40

40 C.F.R. § 52.970 ............................................................................8

40 C.F.R. § 70.4 ...............................................................................23

40 C.F.R. §§ 1502.1 *et seq.* .................................................................7

## **JURISDICTIONAL STATEMENT**

Pursuant to Section 717r(d)(1) of the Natural Gas Act ("NGA"), this Court has "exclusive" jurisdiction to review Sierra Club's Petition for Review of the permit LDEQ issued to Commonwealth LNG, LLC ("Commonwealth") pursuant to the Clean Air Act ("CAA").  15 U.S.C. § 717r(d)(1); 42 U.S.C. §§ 7401 *et seq.*; *see also Town of Weymouth v. Mass. Dep't of Env't Prot.,* 961 F.3d 34, 40–42 (1st Cir.), *on reh'g,* 973 F.3d 143 (1st Cir. 2020); *see also Tex. Comm'n on Env't Quality v. Vecinos Para El Bienestar De La Comunidad Costera,* No. 03-21-00395-CV, 2023 WL 4670340, at *2 (Tex. App.—Corpus Christi, July 21, 2023) ("[T]he NGA provides that exclusive jurisdiction for review of certain TCEQ decisions lies in the United States Fifth Circuit.").  As detailed further below, LDEQ's assertion to the contrary is wrong.

## STATEMENT OF ISSUES

1.  Does this Court have jurisdiction to hear this appeal based on Congress' express delegation to federal circuit courts of "exclusive" authority to hear natural gas permit appeals pursuant to Section 717r(d)(1) of the NGA?

2.  Did the Louisiana Department of Environmental Quality ("LDEQ") act arbitrarily or contrary to law when:

    a.  Consistent with the EPA's Significant Impact Level ("SILs") guidance, LDEQ concluded that Commonwealth's preliminary air emissions screening, which showed that certain emissions were insignificant, sufficiently demonstrated that those emissions will not cause or contribute to air pollution in excess of National Ambient Air Quality Standards ("NAAQS")?

    b.  LDEQ determined that any modeled $NO_2$ NAAQS violation was "likely never to occur" and that Commonwealth's modeled contributions did not cause or contribute to the unlikely 1-hour $NO_2$ NAAQS violation?

    c.  LDEQ relied on AP-42 emissions factors to project Commonwealth's emissions?

2

3.  Was it arbitrary for LDEQ to determine that Commonwealth's combustion turbines and oxidation systems are the "best available control technology?"

4.  Did LDEQ's extensive analysis of the IT Questions articulated in La. R.S. 30:2018.B satisfy the public trust doctrine established by the Louisiana Constitution?

5.  What remedy, if any, should the Court provide to Sierra Club?

## STANDARD OF REVIEW

"Federal courts reviewing state agency action afford the agencies the deference they would receive under state law." *Twp. of Bordentown, New Jersey v. Fed. Energy Regul. Comm'n*, 903 F.3d 234, 270 (3d Cir. 2018). The judicial review provisions of the Louisiana Administrative Procedure Act ("LAPA") govern actions for judicial review of LDEQ permitting decisions. La. R.S. 30:2050.21; *Save Our Hills v. La. Dept. of Env't Quality*, 266 So. 3d 916, 927 (La. App. 2018).

Pursuant to Section 49:978.1(G) of the LAPA, a court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify an agency decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) arbitrary and capricious or characterized by abuse

of discretion or clearly unwarranted exercise of discretion; or (6) not supported or sustainable by a preponderance of the evidence as determined by the reviewing court. La. R.S. 49:978.1(G); *see also Save Our Hills*, 266 So. 3d at 927. Under La. R.S. 49:978.1(G)(5), the court uses the arbitrary and capricious test to review the agency's conclusions and exercises of discretion. *Save Ourselves, Inc. v. La. Environ. Con. Comm'n*, 452 So. 2d 1152, 1159 (La. 1984).[1] The test for determining whether an action is arbitrary or capricious is whether the action taken was "without reason." *Save Our Hills*, 266 So. 3d at 927, citing *Dow Chemical Co. La. Operations Complex Cellulose and Light Hydrocarbons Plants, Part 70 Air Permit Major Modifications and Emission v. Reduction Credits*, 885 So. 2d 5, 10 (La. App. 2004).

The Louisiana Supreme Court has emphasized that the arbitrary and capricious test poses a "significant limitation" on judicial review. *Save Our Hills*, 266 So. 3d at 934. Thus:

> [i]f the evidence as reasonably interpreted supports the determination of the administrative agency, its orders will be accorded great weight and will not be reversed or modified in the absence of a clear showing that the administrative action is arbitrary and capricious. The test for determining whether the action is arbitrary and capricious is "whether the action taken is reasonable under the circumstances." Stated dif-

---

[1]    Louisiana's "arbitrary and capricious" standard of review is akin to the "arbitrary and capricious" standard of review that this Court applies frequently in cases arising under the federal Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*. That standard is highly deferential and narrow, looking only at whether the agency considered the relevant factors and not permitting the court to substitute its judgment for that of the agency. *See, e.g., La. Env'tl Soc'y, Inc. v. Dole*, 707 F.2d 116, 118-19 (5th Cir. 1983).

ferently, the question is whether the action taken was "without reason."

*Id.* As long as the agency's decision was reached procedurally with individualized consideration and balancing of environmental factors conducted fairly and in good faith, that decision is not subject to reversal as a substantive matter unless it was made "without reason." *Id.* at 927.

The standard of review is the same with respect to the Louisiana public trust doctrine. "The constitution does not establish environmental protection as an exclusive goal, but requires a balancing process in which environmental costs and benefits must be given full and careful consideration along with economic, social, and other factors." *Save Ourselves*, 452 So. 2d at 1157. As stated by the Louisiana Supreme Court:

> The environmental protection framework vests in the [LDEQ] a **latitude of discretion** to determine the substantive results in each particular case. Environmental amenities will often be in conflict with economic and social considerations. **To consider the former along with the latter must involve a balancing process. In some instances environmental costs may outweigh economic and social benefits and in other instances they may not. This leaves room for a responsible exercise of discretion** and may not require particular substantive results in particular problematic instances.
>
> * * *
>
> In light of the structure and aims of the public trust doctrine and the environmental act, and the breadth of authority delegated to the [LDEQ], the judicial review function encounters significant limitations in the substantive aspects where the given statutory standards are "arbitrary", "capricious" or "abuse of discretion". **It is elementary**

**that a court's function is not to weigh de novo the available evidence and to substitute its judgment for that of the agency**.

*Id.* at 1157-59 (emphasis added).

Thus, this Court should defer to the reasoned determinations of LDEQ on technical and highly specialized issues that are within LDEQ's unique expertise.

## STATEMENT OF FACTS

### A.     Commonwealth's Cameron Parish Project

Commonwealth is a liquefied natural gas ("LNG") development company focused on LNG export projects.  Commonwealth is developing an LNG export facility located at 500 Gulf Beach Highway in Cameron Parish, Louisiana. AR2:15; AR69:3; AR70:2.  The project is located on the west side of the Calcasieu Ship Channel at its entrance to the Gulf of Mexico.  AR2:15; AR69:3; AR70:2. Commonwealth's project is expected to be a leader in the next wave of LNG development projects and is estimated to include a multi-billion dollar private investment in Cameron Parish and the surrounding area.

### B.     The NGA Governs Commonwealth's Project

In 2005, Congress passed the Energy Policy Act of 2005 (the "Energy Policy Act"), which amended the NGA, 15 U.S.C. §§ 717-717w, to clarify and streamline

the regulatory process for the approval of LNG import and export projects.[2]  The NGA, as amended, gives the Federal Energy Regulatory Commission ("FERC") exclusive jurisdiction over the siting, construction, expansion or operation of LNG import and export facilities pursuant to Section 3.  42 U.S.C. § 7172(a)(1)(D); 15 U.S.C. §§ 717b(a), 717b(e)(1).

An entity seeking to construct an LNG terminal must obtain authorization from FERC to do so.  *See* 15 U.S.C. § 717f(c).  As required by the NGA and the National Environmental Policy Act of 1969 ("NEPA"), FERC conducts a lengthy, detailed review of the environmental, engineering, safety, and economic elements of the proposed project.  15 U.S.C. § 717b-1(a); 42 U.S.C. §§ 4321 *et seq*.  NEPA mandates that, before FERC authorizes an LNG terminal like the one at issue here, FERC must issue a detailed and robust draft environmental impact statement, provide an opportunity for public comment and review, and issue a final environmental impact statement ("FEIS").  *See* 40 C.F.R. §§ 1502.1 *et seq*.  After a FEIS is issued, FERC can then issue a formal order authorizing the project.

---

[2]     "Streamlined permitting processes and NEPA reviews are provided [by the Energy Policy Act] for the siting of liquefied natural gas (LNG) facilities and conventional natural gas storage facilities."  MARK HOLT & CAROL GLOVER, CONG. RESEARCH SERV., RL33302, ENERGY POLICY ACT OF 2005: SUMMARY AND ANALYSIS OF ENACTED PROVISIONS 20.  *See also* Jacob Dweck, David Wochner & Michael Brooks, *Liquefied Natural Gas (LNG) Litigation After the Energy Policy Act of 2005: State Powers in LNG Terminal Siting*, 27 ENERGY L.J. 473, 474 (2006) ("The [Energy Policy Act] amended the Natural Gas Act of 1938 (NGA) to streamline the process for approving natural gas projects…").

In addition, Commonwealth is required to obtain various federal, state and local authorizations, including air quality permits required by the CAA.  42 U.S.C. §§ 7401 *et seq.*  The CAA "establishes a comprehensive program for controlling and improving the nation's air quality through state and federal regulation." *BCCA Appeal Grp. v. U.S. E.P.A.*, 355 F.3d 817, 821-22 (5th Cir. 2003).  The CAA allows the Environmental Protection Agency ("EPA") to establish maximum permissible concentrations of air pollutants in the ambient air and to promulgate National Ambient Air Quality Standards ("NAAQS").  42 U.S.C. §§ 7408-09.  The CAA also establishes a framework permitting the EPA to delegate authority to issue federally required air quality permits to various state permitting authorities, including LDEQ.  42 U.S.C. § 7407.

The States are required to submit to the EPA "a plan designed to implement and maintain [NAAQS] standards within its boundaries," and the EPA is "required to approve each State's plan." *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 65 (1975) (discussing Section 101 of the CAA, 42 U.S.C. § 7410).  These plans are referred to as "State Implementation Plans" or "SIPs." *Luminant Generation Co. v. E.P.A.*, 675 F.3d 917, 921 (5th Cir. 2012).  Louisiana's SIP has been approved by EPA.  See 40 C.F.R. 52.970(c) (identifying EPA-approved regulations in Louisiana's SIP); LAC 33:III.509.

Every State's SIP "must include permitting programs for the construction or modification" of "major" sources of air pollution. *Luminant Generation Co.*, <u>675 F.3d at 922</u>. Major pollution sources may be subject to preconstruction Prevention of Significant Deterioration ("PSD") permitting requirements. *See* LAC 33:III.509 (listing requirements). The PSD requirements, enacted by Congress in 1977, "are designed to ensure that the air quality in attainment areas or areas that are already 'clean' will not degrade." *Alaska Dep't of Env't Conservation v. E.P.A.*, <u>540 U.S. 461, 470</u> (2004). LDEQ's EPA-approved SIP includes the PSD permitting program for the State of Louisiana. LAC 33:III.507, 509.

## C.    Commonwealth's Application to FERC and FERC Authorization

On August 20, 2019, Commonwealth filed its formal application for approval from FERC pursuant to Sections 3(a) of the NGA. <u>15 U.S.C. § 717b(a)</u>; AR85. On September 9, 2022, FERC issued a FEIS, which included a robust and extensive analysis of the potential environmental impacts of the project. AR90:1-707.[3] FERC's FEIS included extensive review and analysis of NAAQS. AR90:4-201-32. Independent from LDEQ's review, FERC concluded that the "operation of the facility would not cause or make a significant contribution to any violation of ei-

---

[3]    There is an error in the Index of Documents Comprising the Record (Doc. 47, p. 5). The FEIS is listed as AR81, but a review of the actual record documents has the FEIS at AR90. AR81 is actually the Final Environmental Assessment for Air Products and Chemicals, Inc. Recovery Act: Demonstration of $CO_2$ Capture and Sequestration of Steam Methane Reforming Process Gas Used for Large Scale Hydrogen Production, June 2011 by the U.S. Department of Energy, which is mistakenly listed on the Index as AR90. References to AR90 in this Brief are to the FEIS issued by FERC.

ther the NAAQS or existing PSD increments." AR90:4-232.  FERC issued a final

order approving the project on November 17, 2022.  AR82:1-90.

## D.    LDEQ's Review of the Permit Application

On April 23, 2021, Commonwealth applied to LDEQ for an air quality per-

mit under the CAA.  AR2:4–367.  LDEQ spent approximately two years engaged

in a careful review of the permit application.  LDEQ is required to conduct a thor-

ough technical review of the application.  LAC 33:III.519.B; LAC 33:I:1505.

LDEQ is able to request, and did request here, additional information in writing to

evaluate the application.  LAC 33:III.519.B; *see, e.g.,* AR2-AR12 (various corre-

spondence between Commonwealth and LDEQ).  LDEQ also published notice re-

questing public comment on the proposed permit and held a public hearing.

AR13-16; AR14-AR16; AR17:68-103.  LDEQ requested and received extensive

public comments.  *See generally* AR19-AR38; AR43-AR46; AR51-67.  As re-

quired by the CAA, LDEQ submitted the draft permit to the EPA and the EPA did

not object.

## E.    LDEQ Issues the Permit

On March 2023, LDEQ issued Part 70 Operating Permit No. 0560-00997-

V0 and Prevention of Significant Deterioration Permit No. PSD-LA-841 (AR70-1-

46 (collectively, the "Permit").  LDEQ issued a basis for decision document that

included a 29-page detailed discussion of its analysis and reasoning and a 162-page

"Public Comments Response Summary" that addressed the issues raised in public comments (collectively, the "Basis for Decision").  AR71:1-191.

## SUMMARY OF ARGUMENT

Pursuant to Section 717r(d)(1) of the NGA, this Court has "exclusive" jurisdiction to review Sierra Club's Petition for Review of the permit LDEQ issued to Commonwealth pursuant to the Clean Air Act ("CAA").  15 U.S.C. § 717r(d)(1); 42 U.S.C. §§ 7401 *et seq.*; *see also Town of Weymouth,* 961 F.3d at 40–42.  Contrary to LDEQ's suggestion, when LDEQ issued the Permit it was acting pursuant to the CAA and Louisiana's EPA-approved SIP, which has the force and effect of federal law.  Further, the NGA, as amended by the Energy Policy Act, provides that "[t]he United States Court of Appeals for the circuit in which the facility…is proposed to be constructed, expanded or operated, shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a…State administrative agency acting pursuant to Federal law to issue…any permit…required under Federal law."  15 U.S.C. § 717r(d)(1).  In passing this provision, Congress expressly intended to streamline the review of state-issued permits required under federal law, including the CAA, for the construction, expansion or operation of natural gas facilities.  Every court to have considered this issue has agreed the under the unique circumstances of the NGA, federal circuit courts have exclusive jurisdiction to review state-issued CAA permits.

11

On the merits, this Court should afford LDEQ's reasoned determinations on the highly specialized and technical aspects of the Permit substantial deference and should not substitute the Court's judgments for that of LDEQ. LDEQ's Basis of Decision was thorough and directly addressed each of the issues raised by Sierra Club in detail. LDEQ's decision making was reasonable and sound on each of the issues now raised in Sierra Club's Brief.

First, LDEQ's use of SILs to evaluate whether emissions cause or contribute to a violation of NAAQS was proper and in accord with EPA guidance. Indeed, the EPA has recommended the use of SILs for decades and views SILs as a "streamlined means of making the air quality impact demonstration required by Section 165(a)(3)" of the CAA. AR91:13. Consistent with EPA and LDEQ guidance, Commonwealth conducted extensive air dispersion modeling and, with the exception of 1-hour $NO_2$, no pollutant showed any exceedance of NAAQS. For those pollutants that did not exceed SILs, it was proper for Commonwealth and LDEQ to conclude that no further air quality analysis was required and that these pollutants would not cause or contribute to NAAQS exceedances.

With regard to 1-hour $NO_2$, Commonwealth performed an additional air quality analyses, including a source contribution analysis to determine "whether the proposed source will cause or contribute to the violation by comparing the proposed source's modeled contribution to that violation to the corresponding SIL

value." AR71:13.  That analysis revealed the Commonwealth's maximum contribution to 1-hour $NO_2$ NAAQS was below the SIL.  Based on this result, it was proper for LDEQ to determine that Commonwealth's project would not cause or contribute to a violation of the 1-hour $NO_2$ NAAQS.

It was also proper for LDEQ to approve of Commonwealth's use of AP-42 emissions factors.  Here, use of the AP-42 emissions factors was reasonable and appropriate because this is a preconstruction permit and direct, site-specific emissions information is not available.  In such circumstances, LDEQ and the EPA recognize that the "default emissions factors" in AP-42 are an appropriate and reasonable method to estimate emissions.  AR71:118.

Second, LDEQ's careful and thorough analysis of whether Commonwealth's proposed facility employs the best available control technology for its combustion turbines and oxidation systems should not be disturbed by this Court.  LDEQ considered each of these technologies in detail against the backdrop of the very same arguments Sierra Club presents here.  LDEQ's Basis for Decision includes detailed explanations for why the technologies employed by Commonwealth do represent the best available control technology.  This Court must show substantial deference to LDEQ's judgment regarding these technologies and should not disturb LDEQ's decisions on these issues.

Third, LDEQ thoroughly and carefully considered the issues identified as relevant to the consideration of the public trust doctrine in the Louisiana Constitution as implemented by the Louisiana Legislature in the Environmental Quality Act. According to the Louisiana Supreme Court, the public trust doctrine applies a "rule of reasonableness" that requires an agency to consider the balance "environmental costs and benefits…along with economic, social and other factors" and "vests in [LDEQ] a latitude of discretion to determine the substantive results in each particular case." *Save Ourselves*, 452 So. 2d at 1157. Here, LDEQ undertook that requisite balancing and, in the exercise of its discretion, reasonably concluded that the Permit should be issued. LDEQ's analysis is entitled to deference from this Court.

## ARGUMENT

### A. The Court Has Exclusive Jurisdiction over this Appeal Pursuant to the Natural Gas Act

The unique circumstance of a federal circuit court directly reviewing an environmental permit issued by a Louisiana State agency is brought about by the interplay of the NGA, as amended by the Energy Policy Act, the CAA, and the Louisiana SIP, as incorporated into federal law. As noted, the NGA is a "comprehensive scheme of federal regulation" that vests the FERC with "exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale,"

and evidences Congress's intent "to occupy [the] field to the exclusion of state law." *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300–01 (1988); *see also Dominion Transmission, Inc. v. Summers*, 723 F.3d 238, 243 (D.C. Cir. 2013), *judgment entered*, 529 Fed. Appx. 3 (D.C. Cir. 2013).  When Congress passed the Energy Policy Act, it extended the reach of the NGA to the siting, construction, expansion, and operation of LNG terminals.  15 U.S.C. § 717b(e)(1).  Importantly, the NGA "strips states of any authority to regulate" natural gas facilities governed by the NGA except for state actions taken under three statutes specifically referenced in the NGA: the Coastal Zone Management Act, the CAA, and the Clean Water Act.  *Delaware Riverkeeper Network v. Sec. Penn. Dep't of Env't Prot.*, 833 F.3d 360, 376 (3d Cir. 2016) (addressing interstate natural gas transmission facilities); *see also Islander East Pipeline Co. v. Conn. Dep't of Env't Prot.*, 482 F.3d 79 (2d Cir. 2006) (addressing an interstate natural gas pipeline); 15 U.S.C. § 717b(d).  Consistent with this doctrine, "a state participates in [CAA] regulation of interstate natural gas facilities by congressional permission, rather than through inherent state authority." *Delaware Riverkeeper*, 833 F.3d at 376.

The CAA "establishes a comprehensive program for controlling and improving the nation's air quality through state and federal regulation." *BCCA Appeal Grp.* 355 F.3d at 821–22.  It does so through "[a]n experiment in cooperative federalism" that assigns responsibility to both the EPA and the states. *Luminant Gen-*

*eration Co.*, 675 F.3d at 921 (quoting *Michigan v. E.P.A.*, 268 F.3d 1075, 1083 (D.C. Cir. 2001)). The EPA "formulat[es] national ambient air quality standards," whereas the states bear the "primary responsibility" for implementing those standards. *Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 308 (2014).

"Every state must formulate and administer a State Implementation Plan (SIP), which outlines the state's pollution control strategy for achieving NAAQS." *Texas v. U.S. E.P.A.*, 690 F.3d 670, 674 (5th Cir. 2012) (citing 42 U.S.C. § 7410(a)(1)). SIPs must include "enforceable emission limitations and other control measures, means, or techniques" to meet NAAQS and must include a scheme for preconstruction permits. 42 U.S.C. § 7410(a)(2)(A); 40 C.F.R. § 51.160; *Texas*, 690 F.3d at 674.

The EPA must review the SIP to ensure compliance with the CAA and provide public notice and an opportunity to comment regarding the SIP. 42 U.S.C. § 7410(a)(2); *see also Texas*, 690 F.3d at 676. To be approved by the EPA, a SIP must include an air quality permit program for the "construction of any stationary source within the areas covered by the plan as necessary to assure that [NAAQS] are achieved." 42 U.S.C. § 7410(a)(2)(C).

Once the EPA approves a particular state's SIP, it can then "delegate to such State any authority…to implement and enforce such standards." 42 U.S.C. § 7411(c). When states like Louisiana conduct the required review for CAA air

permits under an approved SIP, they are implementing federal law under cooperative federalism and they grant or deny air permits pursuant to federal law. *Ammex, Inc. v. Wenk*, 936 F.3d 355, 361-62 (6th Cir. 2019). The fact that SIPs have the force and effect of federal law has been recognized by every federal Circuit Court. *See id.; Utah Physicians for Healthy Env't v. Diesel Power Gear, LLC,* 21 F.4th 1229, 1237 (10th Cir. 2021) ("An approved SIP has the force and effect of federal law") (internal citations omitted); *Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.,* 968 F.3d 357 (5th Cir. 2020)*, as revised,* (Aug. 3, 2020), *and following remand*, 47 F.4th 408 (5th Cir. 2022), *and reh'g en banc granted, vacated,* 61 F.4th 1012 (5th Cir. 2023) ("when the EPA approves a SIP, it becomes federal law"); *Grp. Against Smog & Pollution, Inc. v. Shenango Inc.*, 810 F.3d 116, 120 (3d Cir. 2016) ("Once the EPA approves the SIP, it becomes binding federal law."); *California Dump Truck Owners Ass'n v. Nichols*, 784 F.3d 500, 505 n.6 (9th Cir. 2015) (recognizing that the court had "consistently recognized that an approved SIP is federal law"); *Indiana v. E.P.A.*, 796 F.3d 803, 806 (7th Cir. 2015) ("Once it is approved by EPA, a state rule embodied in a SIP becomes enforceable federal law."); *North Carolina v. Tenn. Valley Auth.*, 615 F.3d 291, 299 (4th Cir. 2010) (Once a SIP is approved, "its requirements become federal law and are fully enforceable in federal court"); *Sierra Club v. U.S. E.P.A.*, 496 F.3d 1182, 1186 (11th Cir. 2007) (Georgia SIP "has the force and effect of federal law and may be enforce by the

EPA in federal courts.") (internal quotations and citations omitted); *Nat. Min. Ass'n v. U.S. E.P.A.*, 59 F.3d 1351, 1363 (D.C. Cir. 1995) ("Once included within the SIP" state law becomes enforceable under federal law); *U.S. v. General Motors Corp.*, 876 F.2d 1060, 1063 (1st Cir. 1989) ("Once an original or revised SIP is approved by the EPA, it becomes federal law"); *Council of Commuter Orgs. v. Metro. Transp. Auth.*, 683 F.2d 663, 669 (2d Cir. 1982) ("New York's SIP [was] enforceable as applicable federal law"); *Union Elec. Co. v. E.P.A.*, 515 F.2d 206, 211 (8th Cir. 1975), *aff'd*, 427 U.S. 246 (1976) (Georgia SIP "ha[s] the force and effect of federal law and may be enforced by the [EPA] in federal courts."). When LDEQ issued the Permit here, it was acting pursuant to the CAA and Louisiana's SIP, which is enforceable as federal law.

Further, the NGA, as amended by the Energy Policy Act, provides that "[t]he United States Court of Appeals for the circuit in which the facility…is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a…*State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit…required under Federal law*." 15 U.S.C. § 717r(d)(1). The legislative history of the Energy Policy Act suggests that "the purpose of the [jurisdiction] provision is to streamline the review of state decisions taken under federally-delegated authority." *Delaware Riverkeeper*, 833 F.3d at 372. Review of a permit

required by the CAA and the NGA is review of a "State administrative agency acting pursuant to Federal law." *Town of Weymouth,* 961 F.3d at 40–41; *see also Tex. Comm'n on Env't Quality,* 2023 WL 4670340, at *3 ("TCEQ was acting pursuant to federal law because it issued the new-source review permit consistent with Texas's SIP and as required by the [CAA].") (citing *Env't Integrity Project v. U.S. E.P.A.,* 969 F.3d 529, 535 (5th Cir. 2020)).

Every case to have considered this issue has found that federal circuit court jurisdiction exists. *Town of Weymouth,* 961 F.3d at 40–41; *Tex. Comm'n on Env't Quality,* 2023 WL 4670340, at *3; *see also Friends of Buckingham v. State Air Pollution Control Bd.,* 947 F.3d 68 (4th Cir. 2020) (stating that the Fourth Circuit "possess[es] jurisdiction pursuant to the Natural Gas Act" to review a Virginia state air permit issued pursuant to NGA and CAA).

In *Town of Weymouth,* for example, the First Circuit noted the EPA had approved the Massachusetts SIP "under the federal CAA" and that that EPA had "delegated authority" to the Massachusetts DEP to administer the federal CAA in Massachusetts. 961 F.3d 40, n. 2. The First Circuit acknowledged the "cooperative federalism" approach and found that "this also provides the federal 'ingredient' for purposes of Article III jurisdiction." *Id.* at 40, n.4 (quoting *Osborn v. Bank of U.S.,* 22 U.S. (9 Wheat.) 738, 823 (1824) ("[W]hen a question to which the judicial power of the Union is extended by the Constitution, forms an ingredient of the

original cause, it is in the power of Congress to give the Circuit Courts jurisdiction of that cause, although other questions of fact or of law may be involved in it.").

In addition, various courts have considered this issue in the context of the Clean Water Act. *Delaware Riverkeeper*, 833 F.3d 360; *Sierra Club v. State Water Control Bd.,* 64 F.4th 187, 195 (4th Cir. 2023). In *Delaware Riverkeeper,* the Third Circuit reviewed a Pennsylvania state agency approval pursuant to the Clean Water Act. Although the Clean Water Act is not administered through SIPs, the court recognized that "[a] state issues a Water Quality Certification for an interstate natural gas facility to certify compliance with state water quality standards, promulgated under federal supervision, as well as with federally-established Clean Water Act Requirements." *Id.* at 371. In fact, the court noted that "a Water Quality Certification is not merely required by federal law: it cannot *exist* without federal law, and is an integral element in the regulatory scheme established by the Clean Water Act." *Id.* (emphasis in original). The court went on the note that "Congress intended state actions taken pursuant to…the Clean Water Act and the Clean Air Act, to be subject to review by the Courts of Appeals" and that "[t]o bar this Court's review…would frustrate the purpose of Congress's grant of jurisdiction." *Id.* at 372. The court further addressed the concern about reviewing "state agency action" in federal court by noting that:

> [the states'] participation in the regulatory scheme of the Clean Water
> Act with respect to interstate natural gas facilities, pursuant to the

Natural Gas Act and after the amendment of Section [717r(d)] consti-
tutes a waiver of their immunity from suits brought under the Natural
Gas Act.  In effect, Section [717r(d)] creates a small carve out from
sovereign immunity.  Under this limited carve out, federal judicial re-
view is proper over those state actions regarding interstate natural gas
facilities pursuant to the Clean Water Act and the Clean Air Act.

*Id.* at 377.

In *Sierra Club v. State Water Control Board*, the Fourth Circuit agreed with
the Third Circuit that the NGA "empowers [federal circuit courts] to hear any civil
action seeking review of federal permits required by [the NGA]." 64 F.4th at 195.
The court concluded that Virginia's Department of Environmental Quality was
"acting pursuant to the authority granted to it through the CWA when it issued
the…Permit" and, accordingly, the court had "jurisdiction to hear this case pursu-
ant to 15 U.S.C. § 717r(d)(1)." *Id.* The court further noted that Section 717r(d)
"put the Agencies on notice that any action they took relative to the issuance, con-
ditioning, or denial of a water quality certification would be subject to federal judi-
cial review." *Id.* at 196.  The same is true for LDEQ and the CAA.

LDEQ mistakenly relies on three things to suggest that this Court lacks ju-
risdiction.  First, LDEQ asserts that the "SIP isn't *actually* federal law."  LDEQ
Brief, p. 21 (emphasis in original).  LDEQ, however, ignores the extensive authori-
ty holding to the contrary and relies on one concurrence in the Sixth Circuit that
suggests the SIP remains part of "state law that states officials enforce." *Ammex*,
936 F.3d at 363 (Bush, J. concurring); LDEQ Brief, p. 21.  Even if that were true

and the SIP and the CAA were somehow considered to be "parallel" state and federal laws, as Judge Bush suggests, there can be no dispute that the Permit is, in fact, issued pursuant to the CAA and a federally-approved and adopted SIP with the intention and purpose of ensuring that Commonwealth complies with federally-promulgated NAAQS and CAA requirements. *See, e.g., Env't Integrity Project*, 969 F.3d at 535 (explaining the purpose and implementation of the CAA via SIPs); *Texas*, 690 F.3d at 677 (same). In issuing this Permit, LDEQ was unquestionably acting pursuant to federal law.

Second, LDEQ builds on its "state law" argument by suggesting that because this is a "state law" permit, the claim asserted here is a "state law" claim. LDEQ Brief, pp. 23-24. Again, LDEQ relies on one concurring opinion to suggest that federal courts cannot rule on state law causes of action. Brief, p. 24 (quoting *Shrimpers and Fishermen of RGV v. Tx. Comm. Of Env't Quality*, 968 F.3d 419, 428 (5th Cir. 2020) (Oldham, J., concurring)).

As noted, however, this Permit was required by the CAA and the NGA. The CAA federally mandates judicial review of state permit decisions. A permitting program must provide "an opportunity for judicial review in State court of the final permit action by the applicant, any person who participated in the public comment process, and any other person who could obtain judicial review of that action under applicable law." 42 U.S.C. 7661a(b)(6). The EPA's regulations likewise require

states to provide an opportunity for judicial review of a final permit by the applicant, any person who participated in the process or any other person who could obtain judicial review of such actions under state law.  40 C.F.R. § 70.4(b)(3)(x).

Thus, the "cause of action" to challenge a CAA permit arises from the issuance of a permit under the CAA and EPA-approved SIP and the federal requirement that states afford an appeal right for such permits.  In most circumstances, the appeal would be to the state court of appeal.  As noted, however, as it relates specifically to natural gas facilities governed by the NGA, Congress expressly intended that the appeal of a CAA permit be "exclusively" in the federal circuit courts.  15 U.S.C. § 717r(d)(1).  Thus, in all respects, Sierra Club's ability to challenge the Permit here arose as a result of federal law and is a federally-mandated cause of action.

Even if this were a state claim, as LDEQ readily acknowledges, "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."  LDEQ Brief, p. 24 (citing *Gunn v. Minton*, 568 U.S. 251, 258 (2013)).  LDEQ suggests that this test does not apply because no federal issue was "necessarily raised" because the decision was pursuant to state law.  This argument is not only circular, it is wrong.  Instead, each of the four *Gunn* factors weighs in favor of finding federal jurisdic-

tion here.  The Permit was issued pursuant to the CAA, and this appeal specifically raises issues related to Commonwealth's compliance with NAAQS and other requirements of the CAA and EPA regulations.  Moreover, Congress's intention regarding the "federal-state balance" was made clear in the NGA when it gave the federal circuit courts "exclusive jurisdiction" over state permits issued pursuant to federal law.

Finally, LDEQ's suggestion that the long-standing practice of "cooperative federalism" employed by the CAA and the federally approved SIPs is a violation of Article II of the Constitution is also without support.  First, despite having been the subject of countless appeals, no case has held that the manner in which the CAA is implemented through state SIPs is a violation of Article II.  Second, LDEQ's reliance on *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4d 869, 872 (5th Cir. 2022) is entirely misplaced.  That case involved a delegation of power to a *private* entity, not a system of "cooperative federalism" adopted by Congress.  Third, LDEQ's reliance on Judge Bush's suggestion that the "EPA appears to have no power to direct a state in how to carry out the enforcement of its SIP" (LDEQ Brief, p. 22), is also wrong.  Contrary to Judge Bush's statement, the EPA has significant authority over how a State enforces its SIP.  The EPA not only approves the SIPs, but each permit must be submitted to the EPA for review to ensure it complies with federal requirements. 42 U.S.C. §§ 7475(d) and 7661d(a)(1).

And, the EPA continues to exercise comprehensive oversight authority, including

authority to disapprove or recall SIPs it finds inconsistent with the CAA, 42 U.S.C.

§ 7410(k), and the ability to impose substantial statutory sanctions if the state fails

to comply with CAA requirements. *See* 42 U.S.C. § 7410(k)(5) and (m), and 7413.

For all of these reasons, the Court should reject LDEQ's assertion that the

Court lacks jurisdiction to adjudicate this appeal. This Court has "exclusive" juris-

diction pursuant to the NGA and should exercise that jurisdiction to affirm

LDEQ's issuance of the Permit.

## B.    LDEQ's Use of Significant Impact Levels Was Proper

### (1)    Significant Impact Levels ("SILs") Have Long Been Used by the EPA and LDEQ

The goals of the CAA include both "protect[ing] public health and welfare"

and "insur[ing] that economic growth will occur in a manner consistent with the

preservation of existing clean air resources." 42 U.S.C. § 7470(1), (3). Pursuant to

the CAA, the EPA establishes NAAQS, which are concentration levels of pollu-

tants in ambient air, "the attainment and maintenance of which" are "requisite to

protect the public health" with "an adequate margin of safety." 42 U.S.C. §

7409(b)(1); *see also*, 40 C.F.R. § 50.2(b). Pursuant to the CAA, a state's air quali-

ty implementation plan must contain measures necessary to prevent "*significant*

deterioration" of air quality in each region designated as attainment. 42 U.S.C. §

7471 (emphasis added). A proposed new facility must demonstrate that "emissions

from construction or operation of such facility will not cause, or contribute to, air pollution in excess" of NAAQS.     42 U.S.C. § 7475(a)(3); *see also* LAC 33:III.509.K.1.

For decades, the EPA has included regulatory thresholds within its preconstruction permitting program designed to help distinguish between sources that may significantly impact air quality and those that will not.  As early as 1978, the EPA explained that § 7475(a)(3) did not require permitting authorities to address impacts "below certain levels." 43 Fed. Reg. 26,388, 26,398 (June 19, 1978); *see also* Mem. From Richard G. Rhoads, Office of Air Quality Planning & Standards, to Alexandria Smith, EPA Region X, "Interpretation of 'Significant Contribution'" (Dec. 6, 1980) at 1, https://www.epa.gov/sites/production/files/2015-07/documents/reaffirm.pdf.  The EPA's 1990 New Source Review Workshop Manual (the "NSR Manual") (October 1990) explained that the EPA "does not require a full impact analysis for a particular pollutant when emission of that pollutant…would not increase ambient concentrations by more than prescribed significant ambient impact levels."  AR93:C.24.

The EPA has affirmed that "SILs have been used in the PSD permitting process for many years to help permit applicants and permitting authorities to determine whether proposed construction may be authorized" by the CAA.  EPA, Significant     Impact     Levels     for     Ozone     and     Fine     Particles,

https://www.epa.gov/nsr/significant-impact-levels-ozone-and-fine-particles.     The EPA uses "SILs "to identify the degree of air quality impact that 'causes, or contributes to' a violation of a NAAQS" and to serve as a "compliance demonstration tool" that a proposed source will not have a significant or meaningful impact on air quality.  *See* AR75:5 (EPA Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program, at 1 (April 17, 2018) (noting that the SIL values "have helped to reduce the burden on permitting authorities and permit applicants to conduct often time-consuming and resource-intensive air dispersion modeling where such modeling was unnecessary to demonstrate that a permit applicant meets the requirements….").

SILs are specifically identified in 40 C.F.R. §51.165(b)(2) as appropriate thresholds for determining if a "major source…will be considered to *cause or contribute* to a violation of a national ambient air quality standard when such source or modification would, at a minimum, exceed the…significance levels."  40 C.F.R. 51.165(b)(2) (emphasis added); *see also* 52 Fed. Reg. 24,672, 24,713 (July 1, 1987) (codifying SIL values as part of the PSD permitting process by promulgating

regulations governing minimum standards for permitting authorities); *Sierra Club v. E.P.A.,* 955 F.3d 56, 59 (D.C. Cir. 2020).[4]

According to LDEQ and the EPA, "SILs do not function to exempt a source from making the demonstration required by section 165(a)(3) of the [CAA]." AR71:33. Rather, "these concentration levels provide a streamlined means of making the air quality demonstration required by section 165(a)(3)." EPA's Legal Memorandum: Application of Significant Impact Levels in the Air Quality Demonstration for Prevention of Significant Deterioration Permitting under the Clean Air Act (the "Legal Memorandum"; AR91); *see also* AR71:33. The Legal Memorandum further explains the justification for SILs as follows:

> A permitting authority has discretion to conclude that a proposed source does not cause or contribute to a violation if its predicted impact on air quality concentrations for the relevant pollutant is not meaningful or significant…Where SIL values developed by EPA are used to show that a source does not cause or contribute to a violation, this permit-specific record can incorporate the information and technical analysis provided by the EPA to show that a source with a projected impact below the relevant SIL value will not cause or contribute to a violation of the NAAQS or PSD increment.

AR91:14; AR71:33.

---

[4]     In 2010, the EPA attempted to codify the use of SILs for certain pollutants. Sierra Club challenged that attempt in the D.C. Circuit. For reasons not relevant here, the EPA asked the D.C. Circuit to vacate the rule. 955 F. 3d at 59. Sierra Club asserted that the court should hold that the EPA could not use SILs for the same "cause or contribute" argument that Sierra Club makes here. The D.C. Circuit declined to invalidate SILs altogether and noted that on remand the EPA could promulgate regulations the "include SILs" as long as they do not "evade the requirements of the [CAA]." *Id.* at 464.

Thus, the EPA has long interpreted and applied the statutory phrase *cause or contribute* to mean that a permitting agency may, in its discretion, conclude that a facility's emissions do not contribute to a NAAQS exceedance if the emissions at the location of a modeled exceedance are below SILs. LDEQ has also interpreted the phrase *cause or contribute* in a manner similar to the EPA, stating that it "uses the SIL values recommended by EPA in implementing its PSD program, LAC 33:III.509." AR71:34. Here specifically, LDEQ incorporated the Legal Memorandum and various SILs guidance documents into its Basis for Decision. AR71:33-34; AR91.

In the Legal Memorandum, the EPA stated that:

In order to give meaning to the "cause or contribute" language in section 165(a)(3) as calling for an exercise of judgment by the permitting authority, it is reasonable to conclude that Congress understood there would be a point at which a small projected air quality impact from a proposed new or modified source becomes so inconsequential that PSD permitting authorities may reasonably conclude that such an impact does not cause, or contribute to, an existing or projected violation of air quality standards.

AR91:8.

LDEQ's decision here to issue the Permit properly followed the extensive and long-standing practice of employing SILs to determine whether the facility will cause or contribute to violations of NAAQS.

### (2) Commonwealth Conducted a Thorough Air Quality Analysis

Consistent with the EPA and LDEQ's guidance, Commonwealth conducted air dispersion modeling using the EPA-recommended "AERMOD" air quality model. AR70:5; AR71-38; AR90:4-225. Based on the AERMOD results, Commonwealth performed a "significance analysis," which "considers emissions only associated with the Project and compares the modeled concentrations to corresponding significant impact levels (SIL) to determine if any predicted concentrations at any receptor locations would be 'significant.'" AR90:4-225; *see also* AR 71:33; AR70:5. Based on the results of the significance analysis, Commonwealth conducted an additional "full impact analysis" in connection with several specific pollutants to further assess compliance with NAAQS. AR70:35; AR71-33; AR90:4-225-28.

This additional analysis included modeling the project's pollutant sources together with background sources from off-site inventory within the area of impact plus 15 km and all major sources within the area of impact plus 20 km. AR90:4-228-29: AR10:20-21. The full impact analysis showed an exceedance of the NAAQS for a single pollutant: 1-hour $NO_2$. AR90:4-228-29, 4-231; AR10:41-44. In compliance with EPA and LDEQ protocols, Commonwealth then conducted a "source contribution analysis" to determine whether the Project would contribute

significantly to the exceedance of the 1-hour $NO_2$ NAAQS.    AR90:4-390; AR10:41.

This "source contribution analysis" revealed that "the maximum contribution to any modeled exceedance of the 1-hour $NO_2$ NAAQS is 0.07 $\mu g/m^3$, which is below the SIL of 7.5 $\mu g/m^3$."  AR71:13, n.44.

### (3)    Sierra Club's Challenges to LDEQ's Use of SILs are Not Warranted

Sierra Club challenges LDEQ's use of SILs in two ways.  First, Sierra Club challenges the use of SILs to conclude that further air quality analysis was not needed for $SO_2$, CO and $PM_{10}$.  Sierra Club Brief, pp. 27-33.  Second, Sierra Club argues that modeled concentrations for $NO_2$ specifically exceeded NAAQS.  Sierra Club Brief, pp. 33-40.

### a)    LDEQ Properly Concluded Additional Air Quality Modeling was not necessary for certain pollutants that fell below SILs

Sierra Club first challenges Commonwealth and LDEQ's use of SILs to conclude that it was not necessary to conduct further air quality analysis for $SO_2$, CO and $PM_{10}$.  Sierra Club Brief, pp. 27-33.  Sierra Club does not contest that Commonwealth's extensive air quality modeling did not identify any modeled exceedances of the SIL values for these pollutants.  *See* AR90:4-229.  Instead, Sierra Club argues that the SILs essentially create a *de minimis* exception to the CAA's "cause or contribute" language that results in automatic exemptions from the CAA's re-

quirements.  Sierra Club Brief, p. 28.  Basically, Sierra Club asks this Court to entirely eliminate the long-standing use of SILs.  This "nonzero" approach cannot be sustained.

First, as the EPA has explained in its guidance, the CAA "does not specify how a permit applicant or permitting authority" must make the required demonstration.  AR75:4.  Instead, the plain language of the CAA "authorizes the EPA to determine how the analysis is to be conducted, including the use of air quality models."  AR75:4.  There is no dispute that Commonwealth followed the EPA guidance in conducting its extensive and multi-step air modeling.  Having done so, it was proper for Commonwealth and LDEQ to conclude that emissions will not cause or contribute to a violation of NAAQS.

Second, Louisiana law is clear that an administrative agency's interpretation of a statute is "given substantial and often decisive weight" when the agency has, over a long period of time, placed that interpretation upon the statute.  *See, e.g., Normand v. Wal-Mart.com USA, Inc.*, 340 So. 3d 615, 631 (La. 2020), (citing *Traigle v. PPG Indus.,* 332 So. 2d 777, 782 (La. 1976) (the "best guide to [the statute's] meaning…is the accepted contemporaneous administrative construction given to the statute…by the agency charged with administering it.").  In such a case, where the legislature has not amended the statute to alter the agency's consistent, longstanding interpretation, the agency's interpretation may "reasonably be pre-

sumed to be in accord with the legislative intent." *Traigle*, 332 So. 2d at 782; *see also Sierra Club v. E.P.A.,* 939 F.3d 649, 680 (5th Cir. 2019) ("The EPA's selection of modeling…is exactly the type of decision for which 'significant deference' is appropriate.").

Third, neither the CAA nor the corresponding LDEQ regulations define the term "contribute." Courts construing that term in other sections of the CAA have found it to be ambiguous such that LDEQ and the EPA's interpretation, if reasonable, is entitled to deference. *See, e.g., Catawba County v. E.P.A.*, 571 F.3d 20, 35, 38 (D.C. Cir. 2009); *see also Env't Def. Fund v. E.P.A.*, 82 F.3d 451, 459 (D.C. Cir.), *amended on other grounds by* 92 F.3d 1209 (D.C. Cir. 1996) (noting that the term contributes "leaves wide open the question of how large a reduction in emissions must be to constitute a contribution."); *Talarico Bros. Building Corp. v. Union Carbide Corp.*, 73 F.4th 126, 142 (2d Cir. 2023) (observing that the term "contribute" has a "capacious definition").

In *Catawba County*, the court addressed Section 107(d) of the CAA, which requires the EPA to designate an area as nonattainment if it "contributes to ambient air quality in a nearby area." 571 F.3d at 35. The court noted that "the statute defines neither 'contributes' nor 'nearby'—words that we have expressly found ambiguous as used in other sections of the Act." *Id.* (citing *Env't Def. Fund*, 82 F.3d at 459). The *Catawba County* court further noted the existence of competing dic-

tionary definitions of the term "contribute"—one that "supports the claim that the adverb 'significantly' is implicit in the verb 'contribute,'" and others that "define 'contribute' without reference to any threshold level of significance." 571 F.3d at 38. Having found the term to be ambiguous, the court found that the EPA had the discretion as to how to interpret and apply that term in the particular context because the term "suggest[s] a congressional intent to leave unanswered questions to an agency's discretion and expertise." *Id.* at 35; *see also Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 980 (2005) (statutory ambiguity amounts to a delegation to the agency "to fill the statutory gap in reasonable fashion"); *Texas v. E.P.A.,* 983 F.3d 826, 836 (5th Cir. 2020) ("Federal courts accord great deference to the EPA's construction of the Clean Air Act.").

Fourth, Sierra Club's citation to various other sections of the CAA that use the term "significant" in conjunction with "contribute" does nothing to advance its argument. Simply noting a statutory term's presence in one section and absence in another "rarely if ever suffices [to provide] the direct answer that *Chevron* step one requires" regarding the meaning of the plain text. *Catawba Cnty.*, 571 F.3d at 36 (citing *Chevron U.S.A. Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984)). To the contrary, as with other ambiguities, "a congressional mandate in one section and silence in another often suggests not a prohibition but simply a decision not to mandate any solution in the second context, *i.e.,* to leave the question to agency

discretion." *Id.* Sierra Club's reliance on *Bluewater Network v. E.P.A.*, 370 F.3d 1 (D.C. Cir. 2004) is unavailing. In *Bluewater*, the court noted that the term "contributes" did not necessarily require a finding of "significance." The court did not, however, suggest that the term "contributes" could *not* incorporate a significance requirement in the proper context.

Fifth, the exercise of LDEQ's discretion to utilize SILs is reasonable and consistent with the stated purposes of the PSD program. As noted, the goal of the CAA is "to protect the public health and welfare from any actual or potential adverse effect…from air pollution [and] to insure economic growth will occur in a manner consistent with the preservation of existing clean air resources.'" *Groce v. Dept. of Env't Prot.*, 921 A.2d 567, 577, n.16 (Pa. Commw. Ct. 2007) (quoting 42 U.S.C. § 7470(1) and (3), Congress's "Statement of Purpose" regarding the PSD program).[5] In *Groce*, the court considered the same issue raised in the present matter, *i.e.*, whether an environmental agency may use SILs in determining that a permit applicant will not cause or contribute to a violation of the NAAQS. The court

---

[5]    The PSD requirements can be contrasted with the more stringent air quality requirements applied to new source review programs for construction and modification in a nonattainment area. Compare 42 U.S.C. §§ 7470 to 7479 with 42 U.S.C. §§ 7502(c)(5), 7503. New source reviews under the PSD program require air quality modeling and use of BACT. 42 U.S.C. §§ 7470 to 7479. In contrast, new source reviews in nonattainment areas require sources to meet stricter lowest achievable emissions rate standards and obtain "emissions offsets." 42 U.S.C. §§ 7502(c)(5), 7503. Sierra Club's effort to vacate this Permit seeks to invoke strict standards without recognizing the balance of the interest inherent in the PSD program required by the CAA.

there relied heavily on the balance of interests inherent in the CAA to affirm the use of SILs.

In sum, LDEQ properly exercised its discretion in (i) approving Commonwealth's use of SILs in its air modeling and (ii) determining that emissions below SILs would not cause or contribute to a NAAQS violation for $SO_2$, CO and $PM_{10}$.

### b)    LDEQ's Use of SILs for $NO_2$ Was Also Proper

Sierra Club next asserts that "Commonwealth's Air Quality Analysis reflects gross exceedance of the NAAQS" and that it was improper for LDEQ to "disregard a demonstrated NAAQS violation by relying on the SILs." Sierra Club Brief, p. 36. LDEQ, however, did not "disregard" any exceedance of NAAQS. Instead, the record reveals that Commonwealth and LDEQ followed EPA guidance and analyzed the $NO_2$ emissions in great detail. There is no basis for this Court to disturb that analysis.

Sierra Club correctly points out that the results of Commonwealth's initial AERMOD modeling revealed $NO_2$ emissions that exceeded SILs. AR10:39-40; AR69:5; AR71:13. Based on this initial modeling, Commonwealth undertook a cumulative "full impact analysis," which modeled maximum impacts plus background stationary sources. AR10:39-41; AR69:6; AR90:4-229-31. This modeling showed an exceedance of the NAAQS for 1-hour $NO_2$. AR10:41; AR69:6; AR90:4-228-29, 4-231.

Sierra Club, however, ignores the fact that, in compliance with the EPA and LDEQ protocols, Commonwealth conducted an additional "source contribution analysis" to determine whether $NO_2$ emissions *from Commonwealth's project* would contribute significantly to the exceedance of the 1-hour $NO_2$ NAAQS. AR10:41; AR90:4-390. According to the EPA,

> Where a cumulative impact analysis predicts a NAAQS violation the permitting authority may further evaluate **whether the proposed source will cause or contribute to the violation by comparing the proposed source's modeled contribution to that violation to the corresponding SIL value**. If the modeled impact is below the recommended SIL value at the violating receptor during the violation, the EPA believes this will be sufficient in most cases for a permitting authority to conclude that the source does not cause or contribute to (is not culpable for) the predicted violation. This demonstration would thus allow the permit to be issued if all other PSD requirements are satisfied.

AR71:13 (emphasis added) (quoting "Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program," AR75:18).

As noted, Commonwealth's "source contribution analysis" showed that "the maximum contribution to any modeled exceedance of the 1-hour $NO_2$ NAAQS is 0.07 $\mu g/m^3$, which is below the SIL of 7.5 $\mu g/m^3$." AR71-13, n.44. Based on this result, LDEQ reasonably concluded that "the Commonwealth LNG Project will not 'cause or contribute' to a violation of the 1-hour NO2 NAAQS." AR71:40.

In addition to following the EPA guidance, LDEQ utilized its extensive ex-

pertise to evaluate Commonwealth's air modeling. In its Basis for Decision, LDEQ pointed out that it is "imperative to recognize that modeled exceedance of a NAAQS do not necessarily equate to *actual* exceedances of a NAAQS." AR71:40 (emphasis in original). Commonwealth's modeling was designed to "derive maximum ground level concentrations for the 1-hour $NO_2$ standard." AR71:40. As such, "Commonwealth LNG modeled the maximum permitted hourly rate of all sources within the modeling domain, effectively assuming that every emissions source emits at its maximum allowable rate continuously." *Id.* The modeling thus provides results that assume "worst-case emissions" from multiple sources, emitting constantly and under the worst-case meteorological conditions. *Id.* This is a circumstance, according to LDEQ, "that is improbable at best and, given the number of sources modeled likely never to occur." AR71:40. Even using this "worst-case emissions" modeling, the $NO_2$ emissions from Commonwealth's project are well below the SIL. AR71-13, n.44. Only if "background" sources are included do the values exceed the SIL. AR71:40. And, according to LDEQ, because "the actual measured ambient concentrations used to represent background are in fact representative and inclusive of contributions from the existing emission sources included in the model," the model is "'double counting' the effect of those existing sources." AR71:40-41.

Based on all of this information, LDEQ reasonably exercised its discretion to conclude that Commonwealth's 1-hour $NO_2$ NAAQS did not exceed the SIL and, as such, the Commonwealth's project would not "cause or contribute" to an exceedance of NAAQS. AR71:13.

### c)    LDEQ's Reliance of AP-42 Factors Was Justified

Sierra Club next contends that LDEQ's reliance on SILs is further "undermined" by their reliance on AP-42 emissions factors. Sierra Club Brief, pp. 41-43. Sierra Club points out that, in 2020, the EPA issued a guidance letter that warned against using AP-42 emissions factors "in place of more representative source-specific emissions value." AR71:114; Sierra Club Brief, p. 41. *Id.* at 41. Under these circumstances, as LDEQ pointed out in its Basis for Decision, it was entirely appropriate to rely, in part, on AP-42. AR71-117-18: *see also* AR84 (AP-42 emissions factors for industrial flares).

As LDEQ pointed out in its Basis for Decision, Commonwealth's emissions calculations had to be prepared "prior to construction," and therefore "cannot be calculated using source-specific data." AR71:118. As the EPA has recognized, "[w]hen direct emission monitoring or site-specific emission factors are not available, then default emission factors may be the only way to estimate emissions." AR71:118 (citing Emissions Estimation Protocol for Petroleum Refineries, Version 3, April 2015 (p. 4-11) (https://www.epa.gov/sites/default/files/2020-1

1/documents/protocol_report_2015.pdf).  For precisely this reason, the EPA developed the AP-42 emissions factors for various types of combustion sources, and the EPA recommends that these factors be used as the "default emission factors" when necessary.  AR71:118.  The use of AP-42 coupled with the existing information Commonwealth had regarding the design and technology anticipated for this project was entirely appropriate and certainly not an abuse of LDEQ's discretion.

Sierra Club next asserts that, to the extent LDEQ did rely on AP-42 factors, it should have used the reported "maximum" emissions factor instead of the "average."  Sierra Club Brief at 43.  According to Sierra Club, this difference could "roughly triple" some projected emissions.  Sierra Club Brief at 43.  LDEQ considered this assertion in its Basis for Decision and, based on its extensive expertise, reasonably concluded that the extreme ends of the ranges are not likely to be representative of actual emissions.  Instead, LDEQ concluded that "the use of average emission factors is appropriate and reasonable."  AR71:107.  The Court should defer to LDEQ's well-reasoned conclusions.

## C.  __LDEQ's BACT Analysis Was Proper__

The CAA specifically requires LDEQ to determine that the proposed facility will be outfitted with the best available control technology ("BACT") for "each pollutant subject to regulation."  42 U.S.C. § 7475(a)(4); *Alaska Dept. of Env't Conservation*, 540 U.S. at 468.  The BACT analysis is a discretionary and factual

one undertaken by LDEQ "on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs." 40 C.F.R. § 52.21(b)(12); LAC 33:III.509.B.  Performing and evaluating a BACT analysis requires extremely specialized, technical expertise and knowledge. *See, e.g., Zen-Noh Grain Corp. v. Consol. Env't Mgmt., Inc.*, No. CIV.A. 12-1011, 2012 WL 6201871, at *10 (E.D. La. Dec. 12, 2012), *amended on denial of reconsideration*, No. CIV.A. 12-1011, 2013 WL 3947186 (E.D. La. July 31, 2013) ("State agencies such as the LDEQ have the expertise, experience, and procedural mechanisms to conduct the air quality analyses and evaluations of proposed technologies that are required in making permit determinations.").

The EPA has established a five-step approach for determining BACT. *See* NSR Manual; AR93:B.5-B.6.  The NSR Manual requires (1) the identification of all control technologies; (2) the elimination of technically infeasible options; (3) the ranking or remaining control technologies by control effectiveness; (4) the evaluation of the most effective control and the documentation of results; and (5) the selection of BACT.  AR93:B.6.

Sierra Club complains about two fact-intensive issues that were already addressed in depth by Commonwealth and LDEQ in their underlying BACT analyses—combustion turbines and a catalytic oxidizer.  Because LDEQ considered all relevant factors and articulated reasons for its decisions regarding these specific

technologies, this Court should not disturb LDEQ's technical determinations within its expertise. *See Alaska Dep't of Env't Conservation*, <u>540 U.S. at 489</u>, <u>490</u> n.4 (explaining that, for the purposes of BACT, the EPA can disapprove a permit only in "relatively rare" circumstances where "a state agency's BACT determination is not based on a reasoned analysis"); *see also Maryland v. E.P.A.*, <u>958 F.3d 1185,</u> <u>1196</u> (D.C<u>. Cir. 2020</u>) (courts "give an extreme degree of deference to [an agencies'] evaluation of scientific data within its technical expertise.").

### (1) LDEQ Properly Analyzed BACT for Commonwealth's combustion turbines

Sierra Club first challenges LDEQ's analysis regarding the most effective technology to control NOx emissions from Commonwealth's nine natural gas fired combustion turbines. Sierra Club Brief, pp. 45-49. There is no dispute that, in an effort to reduce NOx emissions from the combustion turbines, Commonwealth will install a selective catalytic reduction ("SCR") system paired with dry low NOx burners. AR2:277; AR70:12; AR71:83. All parties agree that a SCR system paired with dry low NOx burners is one of "the top-ranked and most effective technologies" to reduce emissions. AR2:276-78, 316; Sierra Club Brief, p. 46. But, Sierra Club challenges the fact that LDEQ approved a numerical emission limit of 2.5 ppmvd instead of 2.0 ppmvd, claiming that other facilities have achieved 2.0 ppmvd by only "slightly" increasing the SCR's effectiveness from 90% to 92%. Sierra Club Brief, p. 46. Sierra Club claims that LDEQ set the limit of 2.5 ppmvd

"without explanation" and "did not even attempt to justify or explain." Sierra Club Brief, pp. 46-47. In making this assertion, Sierra Club ignores the record and LDEQ's vast experience, knowledge and understanding of this specific technology.

LDEQ expressly considered and rejected the very arguments Sierra Club makes here during the permitting process, finding that "[i]t is not appropriate to establish a NOx emission limit for the Refrigeration Turbines and Generator Turbines by applying a control efficiency of greater than 90 percent to NOx concentrations at the inlet of the selective catalytic reduction (SCR) system." AR71:80. Relying on its extensive experience and detailed EPA guidance, LDEQ found that the effectiveness of a SCR system is "dependent on many variables" and "[i]n practice…operates at efficiencies in the range of 70 percent to 90 percent." AR71:81. The EPA guidance further recognizes that even where a specific technology may be capable of achieving a higher control efficiency, LDEQ "has discretion to base the emissions limitation on a control efficiency that is somewhat lower than the optimal level. . .[in order to] allow the permittee to achieve compliance consistently." AR71:82, quoting *In Re Newmont Nev. Energy Inv., LLC. TS Power Plant*, PSD Appeal No. 05-04, December 21, 2005 (EPA E.A.B.) (pp. 460-61).

The EPA guidance thus permits LDEQ to exercise discretion to consider how the efficiency of the technology might "fluctuate" over time and "whether the emissions rate at issue has been achieved by other facilities over a long term."

AR71:82.  Here, LDEQ reasoned that "if SCR systems were routinely and consistently achieving NOx removal efficiencies greater than 90 percent…one would expect to see BACT determination of less than 1 ppmvd."  AR71:83.  But, no such emission limits have been reported to the EPA or cited by Sierra Club.  *Id.*

LDEQ also considered and addressed Sierra Club's argument that various other facilities had set emission limitations for NOx at 2.0 ppmvd.  AR71:83.  As LDEQ noted, those facilities included combined cycle turbines located at electrical generation facilities, not simple-cycle generator turbines configured for Commonwealth's LNG terminal.  *Id.*  Sierra Club claims this is a "distinction without a difference" (Sierra Club Brief, p. 48), but does not explain why this Court should simply reject the well-reasoned determination from LDEQ that it is, in fact, an important technical distinction.  According to LDEQ, Commonwealth's turbines "will employ exhaust heat recovery to heat oil for process use, but will not be equipped with heat recovery steam generations" and will be configured to power compressors, as opposed to generating electricity.  AR71:83.  LDEQ found these differences significant, and this Court should not disturb LDEQ's sound exercise of its expertise and discretion in coming to the conclusion that the emissions limit of 2.5 ppmvd is "appropriate and reasonable."  *Id.*

**(2)     LDEQ properly permitted the use of thermal oxidizers as BACT**

Sierra Club next contends that LDEQ should have required Commonwealth to consider a catalytic oxidizer instead of using thermal oxidizers to remove impurities from the natural gas before liquefaction. Sierra Club Brief, pp. 49-52. Sierra Club contends that Commonwealth failed to consider the catalytic oxidizer as an alternative and claims that there is a "hole in the record" in this regard. Sierra Club Brief, p. 50. But, both Commonwealth and LDEQ addressed the potential use of a catalytic oxidizer and determined that it was not technically feasible. AR71:100.

Sierra Club suggests that LDEQ failed to perform a proper analysis of the technical feasibility because it did not include detailed cost estimates or quantify the emissions impact. Sierra Club Brief, pp. 51-52. Commonwealth and LDEQ did, in fact, perform a sufficient analysis to support the conclusion that the catalytic oxidizer was not technically feasible.

A control option is "technically infeasible" if, "based on physical, chemical, and engineering principles,...technical difficulties would preclude the successful use of the control option on the emissions unit under review." AR93:B.7. Here, LDEQ explained that a catalytic oxidizer was not technically feasible for various highly scientific and technical reasons, including that it would require the addition of (i) a scrubber to remove trace constituents; (ii) a system to manage the scrubber's waste stream; and (iii) a natural gas-fired heater to raise the temperature of the acid gas streams. AR71:100. Commonwealth concluded—and LDEQ agreed

based its expertise—that the required addition of these additional technologies would "needlessly add complexity to the system, would increase capital and operating costs, and would be an additional source of air emissions." This detailed and highly specialized analysis was sufficient to eliminate the catalytic oxidizer as technically infeasible. This Court need not substitute its judgment for that of LDEQ in this regard.

Sierra Club's reliance on *Town of Weymouth*, 961 F.3d at 44-45 and *In re Pennsauken Cnty., N.C. , Res. Recovery Facility*, 2 E.A.D. 667, 672 (Adm'r 1988) for the suggestion that LDEQ was required to include more detailed cost estimates or emissions information in its technical feasibility analysis is misplaced. The cost calculations and information at issue in both of those cases were not related to step 2 of the BACT process where the technical feasibility of a control technology is being considered. Instead, the information at issue there was required in connection with step 4 of the BACT process involving the valuation of the most effective controls and a documentation of results. *See Town of Weymouth*, 961 F.3d at 44; *In re Pennsauken Cnty.*, 2 E.A.D. at 672. LDEQ's conclusion that the catalytic oxidizer was not technically feasible is entitled to deference and should be affirmed.

**D.    Sierra Club's Arguments Regarding Louisiana's Public Trustee Doctrine Should Be Rejected by this Court**

LDEQ has taken the position that the provisions of the Louisiana Constitution and Environmental Quality Act relative to the public trust doctrine have not

been incorporated into Louisiana's federally approved SIP.  LDEQ Brief at pp. 56-

60.  Even if this Court considers the SIP to have incorporated the public trust doc-

trine, LDEQ fulfilled its public trustee duty.  LDEQ's reasoned and supported

permit decision is neither arbitrary nor contrary to law.

Article IX, Section 1 of the Louisiana Constitution provides for a "public

trust for the protection, conservation and replenishment of all natural resources of

the state…insofar as possible and consistent with health, safety and welfare of the

people." *Save Ourselves*, 452 So. 2d at 1154.  Sierra Club contends that, in grant-

ing the Permit, LDEQ violated this public trustee doctrine.  Sierra Club Brief, pp.

52-69.  Sierra Club's arguments regarding the public trustee doctrine should be re-

jected.  LDEQ satisfied any public trustee duty that exists in this context by exten-

sively considering the so-called "IT Questions" articulated by the court in *Save

Ourselves*.

In *Save Ourselves*, the Louisiana Supreme Court considered the public trust

doctrine in the context of the Louisiana Environmental Control Commission

("ECC").[6]  452 So. 2d at 1154-55.  The court began its analysis by noting that Ar-

ticle IX "mandates the legislature to enact laws to implement" a policy of protec-

---

[6] The Environmental Affairs Act of 1979 created the ECC within the Department of Natural Re-
sources and charged it with the responsibility of reviewing each hazardous waste facility permit
application to determine whether the proposed project or facility complies with the constitutional
and legislative standards. Former La. R.S. 30:1062 and 1066.  Later, the ECC was renamed the
Department of Environmental Quality. *See Save Ourselves*, 452 So.2d at 1155, n.5.

tion of the environment.  *Id*. at 1154.  The court then noted that "[i]n implementa-

tion of the public trust mandate, the legislature enacted the Louisiana Environmen-

tal Affairs Act" (the "LEAA"), with a stated purpose to "maintain, protect and en-

hance a healthful and safe environment through regulation of water control, air

quality, solid and hazardous waste, scenic rivers and streams, and radiation."  *Id*. at

1154-55 (citing former La. R.S. 30:1051 *et seq*.).  The court also noted that, as part

of the LEAA, the legislature established the ECC—now LDEQ—and authorized

that agency to carry out the LEAA's purposes and provisions. *Id*. at 1155 (citing

former La. R.S. 30:1062).

The Louisiana Constitution requires environmental protection "insofar as

possible and consistent with the health, safety, and welfare of the people."  La.

Const. art. IX § 1. According to the court,

> This is a **rule of reasonableness** which requires an agency or official,
> before granting approval of proposed action affecting the environ-
> ment, to determine that adverse environmental impacts have been
> minimized or avoided as much as possible consistently with the public
> welfare. Thus, the constitution **does not establish environmental
> protection as an exclusive goal, but requires a balancing process**
> in which environmental costs and benefits must be given full and
> careful consideration along with economic, social and other factors.
>
> * * *
>
> The environmental protection framework **vests in the commission a
> latitude of discretion to determine the substantive results in each
> particular case**. Environmental amenities will often be in conflict
> with economic and social considerations. To consider the former
> along with the latter must involve a balancing process. In some in-

stances environmental costs may outweigh economic and social bene-
fits and in other instances they may not. **This leaves room for a re-
sponsible exercise of discretion** and may not require particular sub-
stantive results in particular problematic instances.

*Save Ourselves*, 452 So. 2d at 1157 (emphasis added).

The *Save Ourselves* court outlined the issues to be considered by the permit applicant and LDEQ. *Id.* at 1157. Those issues have been dubbed the "IT Questions" and have been expressed by LDEQ and in case law as three consolidated questions:

> Whether 1) the potential and real adverse environmental effects of the proposed project have been avoided to the maximum extent possible; 2) a cost benefit analysis of the environmental impact costs balanced against the social and economic benefits of the project demonstrates that the latter outweighs the former; and 3) there are alternative projects or alternative sites or mitigating measures which would offer more protection to the environment than the proposed project without unduly curtailing non-environmental benefits to the extent applicable.

AR71:1, n.1 (citing *Matter of Rubicon Inc.*, 670 So. 2d 475, 483 (La. App. 1st Cir. 1996) (noting that *Save Ourselves* "required satisfaction of…three issues" and expressly amending prior precedent that has articulated five factors); *see also Blackett v. La. Dep't of Env't Quality*, 506 So.2d 749, 754 (La. App. 1st Cir.1987) (articulating what it listed as five IT Questions); *In the Matter of Am. Waste and Pollution Control Co.*, 633 So.2d 188, 194 (La. App. 1st Cir.1993) (same).

To further implement the public trustee doctrine, the Legislature enacted La. R.S. 30:2018 in 1997 and added the three IT Questions to La. R.S. 30:2018.B., as issues to be addressed in an environmental assessment statement submitted by the permit applicant as part of its permit application.

Here, Commonwealth complied with La. R.S. 30:2018B in its permit application. AR2:1 (recognizing the requirement to address the IT Questions in the application); AR2:199-266 (submitting a detailed Environmental Assessment Statement expressly addressing each of the IT Questions in detail). A public hearing was held on the environmental assessment statement in accordance with La. R.S. 30:2018.C. AR15:1; AR17.

LDEQ expressly considered each of the IT Questions. In its Basis for Decision, LDEQ stated:

> LDEQ finds that as a part of the "IT Requirements,'" adverse environmental impacts have been minimized or avoided to the maximum extent possible…In making this determination, LDEQ finds that Commonwealth LNG has complied with all applicable federal and state statutes and regulations and **has otherwise minimized or avoided environmental impacts to the maximum extent possible**. Additionally, LDEQ finds that Commonwealth LNG **has met the alternative sites, alternative projects, and mitigating measures requirements** of *Save Ourselves*. After LDEQ determined that adverse environmental effects had been minimized or avoided to the maximum extent possible, it balanced social and economic factors with environmental impacts…LDEQ finds that **the social and economic benefits of the proposed projects will greatly outweigh their adverse environmental impacts**.

AR71:1.

LDEQ then confirmed that the "details of the LDEQ's reasoning are set forth below" and provided 29 pages of reasoning to support LDEQ's discretionary analysis. LDEQ's individualized and detailed consideration and analysis of the IT Questions in connection with this permitting decision more than satisfied the factors outlined in *Save Ourselves*. LDEQ's analysis, which formed the basis for its ultimate permit decision, articulated a rational connection between the facts found and its decision and is clearly discernible from the record.

Contrary to Sierra Club's argument, LDEQ did not blindly rely on "minimum permitting requirements as a substitute for its public interest obligation." Sierra Club Brief, p. 58. LDEQ considered and analyzed each IT Question. *See, e.g.,* AR71:5-14 (analyzing the "concepts of alternative sites, alternative projects, and mitigation measures" in detail); AR71:15-20 (analyzing "the potential and real adverse environmental impacts…to ensure they are minimized to the maximum extent possible"); and AR71:20-28 (performing a "cost/benefit analysis" that addresses the "social and economic benefits of the proposed facility"). Indeed, LDEQ's entire Basis for Decision is structured to answer the three IT Questions identified on the first page of that decision. AR71:1-29.

Unless "the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental protection," this Court should not substitute its own judgment for that of LDEQ. *Save Ourselves*, 452 S. 2d at 1159; *see also Joseph v. Sec'y of Nat. Res.*, 265 So. 3d 945, 955-56 (La. App. 5th Cir. 2019) (upholding grant of permit where "[t]here is extensive support for DNR's compliance with its public trust duty in the record, including but not limited to its Basis of Decision…"); *Gossen v. Welsh*, 2016 LEXIS 213, at *18 (La. App. 1st Cir. 2016) (affirming permit where "the record demonstrates that the Commissioner reasonably determined that any adverse environmental impacts were minimized or avoided"); *Dow Chem. Co.*, 885 So.2d at 9 ("[C]onsiderable weight is afforded to an administrative agency's construction of a statutory scheme that it is entrusted to administer."); *In re Shintech, Inc.*, 814 So.2d 20, 26 (La. App. 1st Cir. 2002), *writ denied*, 815 So.2d 845 (La. 2002) ("On review, an appellate court should not reverse a substantive decision of [L]DEQ on the merits unless it can be shown that the Secretary of [L]DEQ was arbitrary or clearly gave insufficient weight to environmental protection in balancing costs and benefits of the proposed action.").

Sierra Club's suggestion that LDEQ's analysis was arbitrary is unsupported. Essentially, Sierra Club is suggesting that the public trust doctrine somehow requires LDEQ to devise and apply new and heightened standards of environmental

regulation. The *Save Ourselves* decision did not go that far, and no Louisiana court has interpreted the public trustee doctrine in such an extraordinarily expansive matter. To the contrary, Louisiana courts have confirmed the more limited nature of the doctrine's requirements. *See, e.g., Jurisich v. Jenkins*, 749 So. 2d 597, 605 (La. 1999) (holding that the public trust doctrine of Article IX does not "prime statutorily defined duties"); *see also In re Dep't of Env't Quality Permitting Decision*, 2011 WL 1225871 (La. App. 1st Cir. 2011) (holding that the public trust doctrine did not require LDEQ to employ certain requirements above and beyond existing regulatory requirements); *Save Our Hills*, 266 So. 3d at 932 (holding that the public trust doctrine does not require the agency to balance the "economic impact the project will or may have upon neighboring landowners.").

Sierra Club points to two areas where it maintains LDEQ failed to discharge its public trust duty: (1) use of SILs for measuring risk of exposure to $NO_2$, air toxics and particulate matter; and (2) failure to require certain technical alternatives, including a catalytic oxidizer, a combined-cycle power plant, and electric motor-driven compressors. Each of these issues was "examined, deliberated about, pondered over, and inspected," and LDEQ's decisions were reasonable. *See St. Tammany Par. Gov't v. Welsh*, 199 So. 3d 3 (La. App. 1st Cir. 2016).

First, as detailed above, the use of SILs to determine that the facility will not cause or contribute to violations of NAAQS in accordance with well-established EPA guidance was well-reasoned and technically sound. LDEQ discussed $NO_2$ in detail, concluding that "dispersion modeling predicted Commonwealth LNG's maximum contribution to any modeled exceedance of the 1-hour NO2 NAAQS would be 0.07 µg/m³, which is below the SIL of 7.5 µg/m³." AR71:40. As noted above, LDEQ also explained various aspects of the modeling, including the "improbable" nature of the modeled maximums, that gave LDEQ—based on their expertise—comfort with the use of the SILs and with the level of $NO_2$ emissions. *Id.*

With regard to air toxics, LDEQ concluded that the Commonwealth facility "is not expected to have any appreciable impact on estimated Air Toxics Cancer Risk values in the project area." AR71:27-28. While LDEQ did recognize that the Air Toxics Cancer Risk in Calcasieu Parish is in the 80-90th percentile nationally, LDEQ noted that this risk arising from the emissions of ethylene oxide from other sources in Calcasieu Parish and that Commonwealth's facility is not permitted to emit any ethylene oxide. AR71:27. Again, LDEQ applied its knowledge and expertise to assess the air toxics and reasonably concluded that Commonwealth's facility would not impact risk values in the area. This Court should not disturb that reasoned analysis.

Second, each of the three technical alternatives that Sierra Club complains about was also analyzed in detail by Commonwealth and LDEQ and were dismissed as alternatives only after such analysis. As detailed above regarding the combustion turbines and catalytic oxidizer, LDEQ considered these technologies and concluded they were not BACT for various technical reasons. AR71:80-83, 100. The same is true for electric motor-drive compressors. LDEQ considered and rejected this alternative because it would require Commonwealth to draw power from the nearest power plant rather than producing its own electricity on site. AR71:93. Because "existing local transmission lines do not have the capacity to provide sufficient power to the project area," Commonwealth would be required to "construct a 29.3-mile transmission line to reach the nearest available electrical substation." AR71:93. Such a requirement comes with its own environmental challenges including additional impact to wetlands. AR71:93. Plus, a transmission line of that nature would be susceptible to "damage caused by extreme weather events" that could "shut down operations of the LNG facility for an extended period." AR71:93. LDEQ's determination regarding these technologies was neither arbitrary nor capricious and there is no basis for this Court to find otherwise.

As established in the record, LDEQ actively and affirmatively weighed and considered the IT factors with reasoned explanation based on the application, materials in the record, and comments submitted by members of the public, including

55

those made by members of Sierra Club. Sierra Club's arguments regarding LDEQ's public trustee doctrine should be rejected by this Court.

**E.** **If the Court Grants Any Form of Relief, It Should Remand Without Vacatur.**

Sierra Club's claims lack merit, and this Court should not grant any relief. But, if the Court finds merit in any claims, the relief sought—vacatur—is inappropriate.

Under *Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, the decision whether to vacate an agency order depends on [1] "the seriousness of the order's deficiencies" and [2] "the disruptive consequences of an interim change that may itself be changed." 988 F.2d 146, 150-51 (D.C. Cir. 1993) (internal quotation marks omitted); *see Cent. & S. W. Servs., Inc. v. U.S. E.P.A.*, 220 F.3d 683, 692 (5th Cir. 2000) (applying *Allied-Signal* test). Either *Allied-Signal* factor alone can justify remand without vacatur, *see North Carolina v. E.P.A.*, 550 F.3d 1176, 1177-78 (D.C. Cir. 2008) (per curiam), and here both factors counsel against vacatur.

First, even if this Court finds aspects of the LDEQ's analysis deficient, there is "a serious possibility that [LDEQ] will be able to substantiate its decision on remand." *Allied-Signal*, 988 F.2d at 151. Most of Sierra Club's claims assert that LDEQ based its ultimate conclusions on insufficient analysis. Even if such claims had merit, it would be eminently "plausible that [the agency could] redress its fail-

ure… on remand while reaching the same result." *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013); *accord Cent. & S.W.*, 220 F.3d at 692.

Second, vacatur would have "disruptive consequences" for Commonwealth. *Allied-Signal*, 988 F.3d at 150-51; *Basinkeeper v. U.S. Army Corps of Eng'rs*, 715 F. App'x 399, 401 (5th Cir. 2018) (Owen, J., concurring).  Vacatur could disrupt a critical, multi-billion-dollar infrastructure project—among other things, by potentially delaying its construction timeline and in-service date.  Thus, the proper remedy, if any, would be remand without vacatur.

## **CONCLUSION**

For the reasons stated, Commonwealth requests that this Court deny the Petition.

Respectfully submitted,


/s/ Beth Bivans Petronio
Beth Bivans Petronio
K&L Gates LLP
1717 Main Street, Suite 2800
Dallas, Texas 75201
Telephone:  (214) 939-5500
Facsimile:  (214) 939-5849
Beth.Petronio@klgates.com

Ankur K. Tohan
Washington State Bar No. 36752
ankur.tohan@klgates.com
K&L Gates LLP
925 Fourth Avenue, Suite 2900
Seattle, Washington 98104
Telephone: (206) 370-7658

**ATTORNEYS FOR INTERVENOR
COMMONWEALTH LNG, LLC**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served, via the Court's CM/ECF Document Filing System, upon all counsel of record on this 13th day of November 2023.

*/s/ Beth Bivans Petronio*
Beth Bivans Petronio

## **CERTIFICATE OF COMPLIANCE**

I, Beth Petronio, hereby certify that:

1.  This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this brief contains 12,694 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f) and 5th Cir. R. 32.2.

2.  This brief complies with the typeface and type-style requirements of FED. R. APP. P. 32(a)(5)-(6), and 5th Cir. R. 32.1 because this brief has been prepared in a proportionally spaced typeface using MS Word 2016 Times New Roman, Font Size 14.

3.  The undersigned understands that a material misrepresentation in the certificate of compliance may result in striking the brief and in sanctions against the person signing the brief.

    DATED:  November 13, 2023.

                        */s/ Beth Bivans Petronio*
                        Beth Bivans Petronio

## **ECF CERTIFICATION**

    I, Beth Petronio, certify that: (1) no privacy redactions were required under 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document that I retained; and (3) this document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

                          */s/ Beth Bivans Petronio*
                          Beth Bivans Petronio